Justice Devine delivered the opinion of the Court.
*57Section 12.115 of the Texas Education Code requires the Commissioner of Education to revoke an open-enrollment charter school's charter after three consecutive years of "an unacceptable performance rating," an unsatisfactory "financial accountability performance rating," or any combination of the two. TEX. EDUC. CODE § 12.115(c). The Commissioner's revocation decision is subject to an administrative review, but the decision may not be appealed beyond that. Id. § 12.116(c). Two open-enrollment charter schools nevertheless seek judicial review of the Commissioner's decision to revoke their charters, raising both constitutional and ultra vires complaints. A district court forestalled the Commissioner's revocation by granting temporary injunctive relief. After an interlocutory appeal, the court of appeals vacated the temporary injunctions and dismissed the suit, concluding that sovereign immunity barred the schools' claims. Tex. Educ. Agency v. Am. YouthWorks, Inc. , 496 S.W.3d 244, 270 (Tex. App.-Austin 2016). We agree and affirm.
I. Background
"Since 1995, open-enrollment charter schools have been a part of the Texas public-school system." LTTS Charter Sch., Inc. v. C2 Constr., Inc. , 342 S.W.3d 73, 74 (Tex. 2011). Charter schools are created under and generally governed by chapter 12 of the Education Code. This chapter provides for three charter types: home-rule school district, campus or campus program, and open-enrollment. TEX. EDUC. CODE § 12.002. This appeal concerns open-enrollment charters. Such charters are typically held and run by nonprofit corporations, qualifying under § 501(c)(3) of the Internal Revenue Code. See id. § 12.101(a)(3). Although less common, institutions of higher education and governmental entities are also eligible to apply for such a charter. Id. § 12.101(a)(1), (4).
The petitioners here are American YouthWorks, Inc., which formerly operated the American YouthWorks Charter School (collectively AYW), and Honors Academy, Inc., which formerly operated the Honors Academy Charter School (collectively Honors). Both are private, nonprofit corporations and early charter applicants under chapter 12. See id. § 12.101 (authorizing Commissioner to grant applications for an open-enrollment charter school). AYW obtained its charter in 1996 and describes itself as a drop-out-recovery school serving "Austin's under-served and under-privileged youth, through work, work-study and work training opportunities." Honors received its charter in 1998 and describes its schools as serving a large population of transient, low-income, at-risk students who have not been successful in regular public schools. Honors's schools are located predominantly in north Texas. AYW and Honors continuously operated their schools under renewals until legislative *58changes to chapter 12 led the Commissioner to revoke their charters.
Pertinent here is the work of the Texas Sunset Commission, which in 2012 issued its report on the Texas Education Agency (TEA). The report included a section on charter schools.1 The report noted that, while some charter schools were among the highest-achieving schools, others were among the lowest-performing schools. The Sunset Commission focused on the difficulty in addressing academic and financial issues at these low-performing schools. The report emphasized the TEA's inability to move quickly to revoke charters for poor performance, and that the delay left "students to be educated at under performing charter schools" for too long.2 The Sunset Commission believed that the TEA lacked the tools necessary to effectively address poor academic and financial performance and urged that revocations "should occur more quickly to protect students from an inadequate education."3 The report recommended that the Legislature require the Commissioner of Education to revoke a charter, without a hearing, if the charter school failed to satisfy academic or financial accountability standards for three consecutive years.4
During the 2013 session, the Legislature acted on the Sunset recommendation by amending the Education Code to change the Commissioner's authority in this regard. Before these amendments, the Commissioner had discretionary authority under section 12.115 to revoke a charter or take a lesser adverse action against a charter holder that committed a material violation of its charter, failed in its fiscal management of the school, failed to protect the health, safety, or welfare of its students, or failed to comply with applicable law. Act of May 28, 2001, 77th Leg., R.S., ch. 1504, § 12, 2001 Tex. Gen. Laws 5344, 5350. After the amendment, the grounds listed in section 12.115 became mandatory. TEX. EDUC. CODE § 12.115(a). Moreover, the legislation included additional mandatory grounds for revocation, including one that required the Commissioner to revoke an open-enrollment charter if the school's academic or financial performance fell below acceptable standards over a three school-year period:
(c) The commissioner shall revoke the charter of an open-enrollment charter school if:
(1) the charter holder has been assigned an unacceptable performance rating under Subchapter C, Chapter 39, for the three preceding school years;
(2) the charter holder has been assigned a financial accountability performance rating under Subchapter D, Chapter 39, indicating financial performance lower than satisfactory for the three preceding school years; or
(3) the charter holder has been assigned any combination of the ratings described by Subdivision (1) or (2) for the three preceding school years.
Id. § 12.115(c). In determining the years of unsatisfactory performance, the Commissioner was directed to begin with the three-year period immediately preceding the legislation:
(c-1) For purposes of revocation under Subsection (c)(1), performance during the 2011-2012 school year may not be *59considered. For purposes of revocation under Subsection (c)(1), the initial three school years for which performance ratings under Subchapter C, Chapter 39 [academic accreditation], shall be considered are the 2009-2010, 2010-2011, and 2012-2013 school years. For purposes of revocation under Subsection (c)(2), the initial three school years for which financial accountability performance ratings under Subchapter D, Chapter 39 [financial accountability], shall be considered are the 2010-2011, 2011-2012, and 2012-2013 school years. This subsection expires September 1, 2016.
Id. § 12.115(c-1).
The legislation also amended the procedure for revoking a charter under section 12.115. It directed the Commissioner to adopt an informal procedure to implement review of the Commissioner's now mandated revocation decisions. Id. § 12.116(a). An appeal of that decision to the State Office of Administrative Hearings (SOAH) was permitted, but the appeal was not a contested-case hearing or subject to the Administrative Procedure Act. Id. § 12.116(b). Instead, the legislation provided that the administrative law judge was to review the Commissioner's decision under an "arbitrary and capricious or clearly erroneous" standard and that the judge's determination was final and not subject to judicial review. Id. § 12.116(c). These revisions to the Education Code took effect on September 1, 2013.
On December 18, 2013, the Commissioner notified AYW and Honors by letter that their schools had been identified as charters that met the criteria for mandatory revocation under the new legislation. In these letters, the Commissioner explained that he was revoking its open-enrollment charter (effective June 30, 2014) under Education Code § 12.115(c). He cited the performance ratings that were the basis for each recipient's charter revocation and attached exhibits corresponding to the identified ratings. The Commissioner also noted that the performance ratings on which the revocations were based were "final and not appealable" because "all rights to appeal the ratings identified above had been waived or exhausted."
The letters further described the informal appeals process available to the schools: they had "the right to request an informal review of, and hearing regarding" the Commissioner's revocation decision, but "only if the charter holder submits a written request that contains specific answers to each of the findings included in this Notice." The Commissioner explained further that if the charter holder's timely request was denied during the informal review, the charter school's revocation issue would be sent to the SOAH for a hearing under § 12.116. Finally, the Commissioner noted that the SOAH hearing would be "limited to the specific findings and revocation detailed in this correspondence," that his decision would be upheld "unless the judge finds the decision is arbitrary and capricious or clearly erroneous," and that the SOAH judge's decision would be final and not subject to further appeal.
AYW pursued the Commissioner's informal review process, but the Commissioner determined that he would proceed with the revocation. The Commissioner then forwarded AYW's appeal to the SOAH. After receiving notice of the denial of its informal appeal and the SOAH hearing date, AYW filed suit against the Commissioner and the Texas Education Agency (hereafter collectively referred to as "Commissioner") in district court.
Honors also pursued its right to an informal review with the Commissioner who again determined that the revocation would proceed. Honors's appeal was forwarded to the SOAH, and the administrative *60law judge issued a decision upholding the revocation on May 20, 2014. Before that occurred, however, Honors intervened in AYW's pending litigation against the Commissioner.
II. The Judicial Proceedings
AYW asserted several claims in its district-court petition, including the deprivation of a vested property right without due process, the unconstitutional impairment of contract based on the retroactive use of past financial ratings to revoke AYW's charter, and ultra vires claims. AYW sought a temporary injunction specifically to stop the SOAH hearing from proceeding and more generally to prevent the revocation from occurring. Honors's petition alleged similar claims and sought similar relief, although it did not seek to stop its SOAH hearing.
The Commissioner responded with a general denial and plea to the jurisdiction. Hearings ensued after which the district court issued two orders temporarily enjoining the Commissioner from (1) taking any further action to revoke AYW's charter and (2) from taking any further action to impair Honors's educational operations or enforce any order revoking Honors's charter. The respective injunctions were slightly different because the administrative law judge decided Honors's SOAH appeal before the district court issued the temporary injunction.
The Commissioner immediately appealed the temporary injunctions. The district court subsequently denied the Commissioner's plea to the jurisdiction, and the Commissioner appealed that interlocutory order as well. The Commissioner's two appeals were consolidated for decision in the appellate court. The court of appeals vacated the temporary injunctions and dismissed AYW's and Honors's underlying claims, concluding that all claims were barred by sovereign immunity. 496 S.W.3d at 270. Petitions for review in this Court followed.
III. The Petitions for Review
The Petitions here challenge the validity of the Commissioner's decision to revoke AYW and Honors's respective charters, but chapter 12 does not provide for judicial review of these administrative orders. See TEX. EDUC. CODE § 12.116(c)(2) (making decision of the administrative law judge final). Moreover, "[i]t is well settled that trial courts may review an administrative action only if a statute provides a right to judicial review, or the action adversely affects a vested property right or otherwise violates a constitutional right." In re Office of the Attorney Gen. , 456 S.W.3d 153, 157 (Tex. 2015) (per curiam) (citing Stone v. Tex. Liquor Control Bd. , 417 S.W.2d 385, 385-86 (Tex. 1967) ). Because the statute does not provide for judicial review, AYW asserts both due process and contractual impairment/retroactivity claims based on an asserted vested right to its charter. See TEX. CONST. art. I, §§ 16, 19. AYW also asserts that the Commissioner's actions were ultra vires, precluding the application of sovereign immunity and providing another path to judicial review. See City of El Paso v. Heinrich , 284 S.W.3d 366, 372 (Tex. 2009) (noting "that suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity"). Honors confines its argument to the Commissioner's alleged ultra vires actions in revoking its charter. We begin with AYW's constitutional claims.
A. AYW's Constitutional Claims
The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities ... except by the due course of *61the law of the land." TEX. CONST. art. I, § 19. Our due course clause is nearly identical to the federal due process clause, which provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law...." U.S. CONST. amend. XIV, § 1. Because the two are so similar, "we have traditionally followed contemporary federal due process interpretations of procedural due process issues." Univ. of Tex. Med. Sch. at Houston v. Than , 901 S.W.2d 926, 929 (Tex. 1995) ; see also Patel v. Tex. Dep't of Licensing & Regulation , 469 S.W.3d 69, 86 (Tex. 2015) (noting the typical alignment of federal and state law in this area).
Before any substantive or procedural due-process rights attach, however, the citizen must have a liberty or property interest that is entitled to constitutional protection. Klumb v. Hous. Mun. Emps. Pension Sys. , 458 S.W.3d 1, 15 (Tex. 2015). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ...." Bd. of Regents of State Colls. v. Roth , 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). To have a constitutionally protected property interest, a person must have a "legitimate claim of entitlement" rather than a mere "unilateral expectation." Id. Texas law similarly states that a "vested right" is "something more than a mere expectancy based upon an anticipated continuance of an existing law." City of Dallas v. Trammell , 129 Tex. 150, 101 S.W.2d 1009, 1014 (1937).
AYW asserts that it was denied due process in the revocation of its charter, but before determining what process was due, we first consider whether AYW has a "property interest that is entitled to procedural due process protection." Klumb , 458 S.W.3d at 15. In other words, we must determine that AYW possessed a vested right to its charter.
The court of appeals concluded that AYW's charter was not a "vested" or constitutionally protected property interest. 496 S.W.3d at 262. To the contrary, the court stated that specific provisions in the charter and the Education Code "conclusively negate[d] any such possible property interest." Id. at 261. The court noted that "[s]ome substantive limit on the State's discretion is an essential characteristic of a property interest warranting constitutional protection," Id. (quoting Grounds v. Tolar Indep. Sch. Dist. , 856 S.W.2d 417, 418 (Tex. 1993), and that here, state law and the charter itself gave the "State[ ] unlimited discretion over the charters." Id.
AYW, of course, disagrees. AYW views its charter as a contract with the State for an open-enrollment charter school that vested upon execution and, according to AYW's argument, could not be divested or impaired thereafter absent due process of law. AYW's original charter incorporated by reference all applicable requirements of state and federal law, and although the charter did not specifically mention Education Code § 12.115, it did paraphrase some of that section's requirements, providing:
Charterholder understands that the Board may modify, place on probation, revoke or deny renewal to a charter if the Board5 determines that a material violation of the charter has occurred, that Charterholder has failed to satisfy generally accepted accounting standards of fiscal management, or that the Charterholder *62has failed to comply with an applicable law or rule.
AYW's subsequent charter renewal in 2002 did not again paraphrase the revocation grounds, but rather simply incorporated "applicable law." AYW contends that its charter incorporated a "for cause" provision, specifically the limitations on revocation found in its original charter and in Education Code § 12.115, asserting that these limitations on State discretion created its vested right.
The Commissioner responds that AYW's charter is not a property right that can be distinguished from the legislative mandate creating such right. Because the charter-school system is a legislative creation, AYW's right to operate a school rests entirely on the Legislature's decision to continue the system. Moreover, AYW's right to any particular terms rests on the Legislature's decision to continue the current law because a charter's terms are governed by statute. Thus, although AYW's charter and its renewal take the form of a contract, both documents anticipate and incorporate changes to the law governing charters as they arise. The original charter incorporated "amendments" to the state and federal law governing charter schools, while the charter renewal incorporated all applicable law, which included Education Code § 12.1071. Under that section, AYW's acceptance of state funds constitutes its agreement to any amendments to the laws governing charter schools. TEX. EDUC. CODE § 12.1071. Because AYW's original charter and subsequent renewal recognize the Legislature's authority to alter the charter's terms, the Commissioner submits the documents are inextricably intertwined with the Legislature's regulatory authority, rendering AYW's interest in its charter "entirely contingent on State discretion," and not a vested property right. See 496 S.W.3d at 262.
An open-enrollment charter school is "indisputably part of the Texas public-education system." LTTS Charter Sch., 342 S.W.3d at 76. Thus, AYW's contention is that its charter with the State created a contractual relationship that vested its place in that system. The nature of that relationship and AYW's underlying rights therein thus require an examination of the laws that made AYW a part of public education.
The State's relationship with its open-enrollment charter schools is principally set forth in chapter 12 of the Education Code (the Charter Schools Act). Enacted as part of major reforms to the Texas education system in 1995, the chapter's stated purposes included the establishment of "a new form of accountability for public schools" and the encouragement of "different and innovative learning methods." TEX. EDUC. CODE § 12.001(a)(4)-(5). State oversight of this new component of the public school system remained, however, to "ensure[ ] the fiscal and academic accountability" of the charters. Id. § 12.001(b). That oversight, however, was not to be "applied in a manner that unduly regulates the instructional methods or pedagogical innovations of the charter schools." Id.
A charter is obtained by application to the Commissioner, who, along with a designated member of the Board of Education, is charged with "throughly investigating and evaluating an applicant." Id. § 12.101(b). As already mentioned, applicants are typically nonprofit, 501(c)(3) corporations. See id. § 12.101(a)(3). Any charter the Commissioner proposes to grant may be reviewed and denied by the Board, but if not, the charter takes effect 90 days after notice. Id. § 12.101(b-0). The number of charters the Commissioner may grant, however, is limited by statute. See id. § 12.101.(b-1)-(b-2).
*63The charter for an open-enrollment charter school is "in the form of a written contract signed by the commissioner and the chief operation officer of the school." Id. § 12.112. The initial term is for five years, and if the charter is renewed, the renewal is for ten years. Id. §§ 12.101(b-5), .1141(i). Once chartered, the school is authorized to provide instruction to students under the charter's described structure, and the school retains that authority subject to renewal under section 12.1141, revocation under section 12.115, and Chapter 39A, which pertains to other actions the Commissioner may take when a school fails to meet academic and financial accountability standards. Id. § 12.102. Open-enrollment charter schools do not have the power to tax, Id. § 12.102, but they generally are entitled to state funding, Id. § 12.106, and services, Id. § 12.104(c), as if they were school districts. Open-enrollment charter schools are subject to the Education Code and the rules adopted under it only to the extent specifically provided. Id. § 12.103(b). Open-enrollment charter schools also accept changes to applicable law made after the effective date of their charters by accepting state funds. Id. § 12.1071(a).
This legislative scheme indicates that an open-enrollment charter is a new and innovative form of public schooling rather than a mere contract to outsource public education to a private entity. And while charter schools are designed to foster greater flexibility through less regulation, they are regulated nonetheless. Rather than create an ownership interest or vested right in public education, the charter is in the nature of a license or permit to operate a charter school subject to applicable laws and regulations. Cf. Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist. , 908 F.Supp.2d 597, 609 (M.D. Pa. 2012) (holding that relationship is regulatory, not contractual). We accordingly agree with the court of appeals that the Legislature has neither bargained away its discretion over this aspect of public education nor created vested private-property rights in the creation of the charter school system. 496 S.W.3d at 261.
AYW maintains, however, that the Legislature created its vested right in the charter by establishing a "for cause" limitation on its revocation. AYW argues further that the Commissioner's discretion in applying that "for cause" limitation is what is at issue rather than the Legislature's authority over the public school system. AYW submits that "where an official or administrator is the decision-maker charged with administering a right, the proper analysis for determining whether the right is vested is the existence of limitations placed on the decision-making official or administrator's discretion to impair the right," citing Grounds v. Tolar Independent School District , 856 S.W.2d 417, 418 (Tex. 1993), in support. The Texas League of Community Charter Schools6 and the Texas Charter Schools Association7 have filed amicus briefs that similarly rely on our decision in Grounds to support AYW's due process claim.
The amici argue that an open-enrollment charter is a contract that creates a vested property interest in the charter issued by the Commissioner. See TEX. EDUC. CODE § 12.112 (providing that an open-enrollment charter "shall be in the form of a written contract"). They submit that a constitutionally protected property interest includes *64"an individual entitlement grounded in state law, which cannot be removed except 'for cause,' " Logan v. Zimmerman Brush Co. , 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), and analogize the situation here to that in Grounds where we noted a substantive limit on the State's discretion as an "essential characteristic" of a protected property interest. Grounds , 856 S.W.2d at 418.
In Grounds , we considered the effect of the Term Contractual Renewal Act on a school district's right to terminate a teacher's employment. Id. at 420. We found it "constitutionally significant" that the law required "preestablished reasons" for the nonrenewal of a teaching contract. Id. at 418. Those previously established reasons limited the district's discretion to decline renewal for other reasons. Id. at 418-19.
In contrast, the statute here required the Commissioner to revoke the open-enrollment charters for the specific reason he applied. See TEX. EDUC. CODE § 12.115(c). But apart from that distinction, a more basic structural reason stands in the way of AYW's due process claim. The Education Code does not treat the charter holder or school like a private citizen; unlike the teacher in Grounds , they exist as a part of the public school system. Id. § 12.105. For most purposes, they function as governmental entities.
Thus, we held in LTTS Charter School that an open-enrollment charter school was a "governmental unit" for purposes of the Tort Claims Act, entitled to an interlocutory appeal from an order denying its plea to the jurisdiction. LTTS Charter Sch., 342 S.W.3d at 74-75. In reaching this conclusion, we pointed to specific legislative grants of authority to open-enrollment charter schools, including the grant of all powers given to traditional public schools under Title 2 of the Education Code. Id. at 77 (citing TEX. EDUC. CODE § 12.104(a) ). We commented further that open-enrollment charter schools "have statutory entitlements to state funding" and services that "school districts receive," are generally subject to the laws and rules pertaining to public schools, and are obligated to comply with many of the requirements of educational programs that apply to traditional public schools, including accountability programs. Id. at 77-78 (citing TEX. EDUC. CODE §§ 12.103(a) - (b), .104, .106(a) ). Additionally, we noted that open-enrollment charter schools are subject "to a host of statutes that govern governmental entities outside the Education Code," including statutes imposing open-meetings, public-information , and record-regulation requirements. Id. at 78 (citing TEX. EDUC. CODE §§ 12.1051, .1052). We noted further that the Legislature expressly granted open-enrollment charter schools the same immunity from liability as school districts. Id. at 78 n.44. We explained that open-enrollment charter schools are expressly considered "governmental entit[ies] for ... [statutes] relating to property held in trust and competitive bidding," "political subdivision[s] for ... [statutes concerning] procurement of professional services," and "local government[s] for ... [statutes governing] authorized investments." Id. at 78 (citing TEX. EDUC. CODE § 12.1053 ) (internal quotation marks omitted). Finally, we expressed "confiden[ce] that the Legislature considers" open-enrollment charter schools "institution[s], agenc[ies], or organ[s] of government" under the Tort Claims Act given their statutory status as part of the public-school system, "their authority to wield" the powers given to public schools, and their right to "receive and spend state tax dollars (and in many ways to function as a governmental entity)." Id. (citing TEX. EDUC. CODE §§ 12.104(a), .105-.107, .1053).
During the next legislative session, the Legislature essentially codified our holding *65in LTTS , agreeing that an open-enrollment charter school is a governmental unit as defined in the Tort Claims Act and providing for its liability in the same manner as a school district. TEX. EDUC. CODE § 12.1056(b). In that same session, the Legislature also expanded charter-school immunity to include immunity from suit and added charter holders to the immunity granted:
In matters related to operation of an open-enrollment charter school, an open-enrollment charter school or charter holder is immune from liability and suit to the same extent as a school district, and the [ ] employees and volunteers of the open-enrollment charter school or charter holder are immune from liability and suit to the same extent as school district employees and volunteers. A member of the governing body of an open-enrollment charter school or of a charter holder is immune from liability and suit to the same extent as a school district trustee.
Act of May 29, 2015, 84th. Leg., R.S., ch. 922 (H.B. 1171), § 1, 2015 Tex. Gen. Laws 3187 (codified as TEX. EDUC. CODE § 12.1056(a) ). More recently, we have noted other "instances in which the [Charter Schools Act] treats open-enrollment charter schools as governmental entities," making them
• a governmental unit under the Tort Claims Act and subject to the same liability as a school district;
• a local government under statutes regarding payment of tort claims, interlocal cooperation contracts, and self-insurance (except for issuing public securities);
• a local governmental entity under the Local Government Contract Claims Act and subject to the same liability as a school district; and
• a political subdivision for purposes of the Texas Political Subdivisions Uniform Group Benefits Program, and at the school's election, for purposes of extending workers' compensation benefits.
Neighborhood Ctrs. v. Walker , 544 S.W.3d 744, 753, 2018 WL 1770309 (Tex. 2018) (footnotes and citations omitted).
AYW's status as a public school and governmental entity implicates a line of U.S. Supreme Court cases which hold that neither the Contract Clause nor the Due Process Clause protect subordinate units of government from the acts of their creators. See Ysursa v. Pocatello Educ. Ass'n , 555 U.S. 353, 363, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009) (quoting Williams v. Mayor of Baltimore , 289 U.S. 36, 40, 53 S.Ct. 431, 77 L.Ed. 1015 (1933) ) (recognizing that "a subordinate unit of government created by the State to carry out delegated governmental functions" or "a political subdivision, 'created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator' "); Coleman v. Miller, 307 U.S. 433, 441, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (observing that "municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator"); City of Trenton v. New Jersey , 262 U.S. 182, 188, 43 S.Ct. 534, 67 L.Ed. 937 (1923) (same); and Hunter v. City of Pittsburgh , 207 U.S. 161, 178-79, 28 S.Ct. 40, 52 L.Ed. 151 (1907) (same).
In Hunter , the Supreme Court held that a political subdivision could not invoke the Contract Clause to protect its contracts or the Fourteenth Amendment to protect its property because "[t]he number, nature and duration of the powers conferred upon [municipal] corporations and the territory *66over which they shall be exercised rests in the absolute discretion of the state." Hunter , 207 U.S. at 178, 28 S.Ct. 40. The state was therefore free to force the merger of Pittsburgh and Allegheny because the laws giving political subdivisions their powers and boundaries were not "contract[s] with the state within the meaning of the Federal Constitution." Id. In Trenton , the Court followed its reasoning in Hunter to deny the city's claim that a state tax impaired an existing contract. There, Trenton had purchased the right to draw water from the Delaware River from a water company, which had received the right by grant from the state. Trenton , 262 U.S. at 184, 43 S.Ct. 534. The state subsequently required all entities drawing water from rivers to pay a fee if they drew over a specified amount. Id. at 183-84, 43 S.Ct. 534. Trenton protested that the fee impaired its contract with the water company and deprived the city of property without due process of law. Id. at 183, 43 S.Ct. 534. The Court denied the claim, writing that "[t]he power of the state, unrestrained by the contract clause or the Fourteenth Amendment, over the rights and property of cities held and used for 'government purposes' cannot be questioned." Id. at 188, 43 S.Ct. 534.
In the court of appeals, AYW argued that its open-enrollment charter school was not a governmental entity for all purposes and that the nonprofit corporation holding the charter was a private entity that did not owe its existence to the state. AYW, however, agrees that the powers and existence of its open-enrollment charter school are derived from the Legislature, but submits that its own powers and existence as a private, nonprofit corporation do not, particularly with respect to activities related to AYW's non-education components. In addition to its charter school, AYW states that it provides work training and community service opportunities for its youth and that the revocation of its charter has inhibited its ability to secure funding for the community services it continues to offer.
But the court of appeals' decision says nothing about these activities or AYW's continued existence as a nonprofit corporation. Indeed, all that was before the court was AYW's right to continue operating its open-enrollment charter school, an entity owing its powers and existence to the Legislature.
Entities created to perform a governmental function, though clearly subordinate to their creator, are not without recourse, however. For example, a state may revoke the charter of a political subdivision, but must preserve a means for the subdivision's creditors to satisfy their claims. Port of Mobile v. U.S. ex rel. Watson , 116 U.S. 289, 305, 6 S.Ct. 398, 29 L.Ed. 620 (1886). The Supreme Court has also found exceptions to the state's broad powers where their exercise clashed with important federal interests. See Gomillion v. Lightfoot, 364 U.S. 339, 341, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (recognizing Fifteenth Amendment claim for gerrymandering city boundaries to exclude African-American citizens); Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (holding unconstitutional under the Establishment Clause a New York law that carved a school district around a community of Satmar Hasidic Jews). In Gomillion, the Supreme Court limited the holdings of Hunter and Trenton , explaining that "the State's authority is unrestrained [as against political subdivisions] by the particular prohibitions of the Constitution considered in those cases," rather than granting the states "plenary power to manipulate in every conceivable way ... the affairs of municipal corporations."
*67Gomillion, 364 U.S. at 344, 81 S.Ct. 125. But those concerns are not raised here.
Although the Hunter / Trenton line of authority are no longer considered by most courts as an absolute bar to suit, they continue to deny suits by subordinate governmental entities based on the contractual and due process concerns raised by AYW. See City of Hugo v. Nichols , 656 F.3d 1251, 1256 (10th Cir. 2011) (recognizing a political subdivision's right to sue its creator under the Supremacy Clause but not as an individual liberty interest); S. Macomb Disposal Auth. v. Twp. of Washington , 790 F.2d 500, 504-05 (6th Cir. 1986) (suggesting Supremacy Clause claim allowed); United States v. Alabama, 791 F.2d 1450, 1454-55 (11th Cir. 1986) (Fourteenth Amendment claims barred); Rogers v. Brockette , 588 F.2d 1057, 1070 (5th Cir. 1979) ("[T]he Constitution does not interfere with a state's internal political organization."); City of Alpine v. Abbot , 730 F.Supp.2d 630, 632-33 (W.D. Tex. 2010) (noting that political subdivisions of a state are not protected by the Due Process Clause); City of Bristol v. Earley , 145 F.Supp.2d 741, 744 (W.D. Va. 2001) (noting similar holdings); but see Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360, 1363-64 (9th Cir. 1998) (no political subdivision suit against parent state allowed). For example, in Rogers v. Brockette , a school district challenged the constitutionality of a Texas statute that required the district's participation in a federally subsidized breakfast program. 588 F.2d at 1059. The school district objected to being required by the state to participate in the program, arguing that because the federal program itself did not require participation, federal law should prevail under the Supremacy clause, and the district should be allowed to choose not to participate. Id. at 1060. While cognizant of the Hunter / Trenton line of authority, the Fifth Circuit concluded the line was not an absolute bar to a political subdivision's suit against its state creator but rather "substantive interpretations of the constitutional provisions involved." Id. at 1068. The court distinguished between cases where a political subordinate brings a claim based on an individual right guaranteed by the Constitution and those in which a subordinate complains that a particular state law conflicts with federal law in violation of the Supremacy Clause. Id. at 1070. The court concluded that only the latter present viable claims because "Congress may interfere with a state's internal political organization in ways that the Constitution itself does not interfere." Id. After Rogers , the Tenth Circuit elaborated on the distinction: " '[A] municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights,' as opposed to constitutional provisions designed to protect 'collective or structural rights' (i.e. the Supremacy Clause)." City of Hugo , 656 F.3d at 1256 (alteration in original) (quoting Branson Sch. Dist. RE-82 v. Romer, 161 F.3d 619, 628 (10th Cir. 1998).
Our state law similarly provides that "Municipal Corporations do not acquire vested rights against the State." Deacon v. City of Euless, 405 S.W.2d 59, 62 (Tex. 1966). In Deacon , this Court applied a statute retrospectively to invalidate a City's annexation ordinance that had been adopted before the statute's effective date. Id. at 59. More recently, we applied this same principle to sovereign immunity: "A governmental entity cannot complain of a retroactive waiver of immunity, since all governmental immunity derives from the State, and a governmental entity acquires no vested rights against the State."
*68Tooke v. City of Mexia , 197 S.W.3d 325, 345 (Tex. 2006). And we have also cited Trenton when rejecting a governmental entity's "due course of law" claim under the Texas Constitution. See City of Fort Worth v. Zimlich, 29 S.W.3d 62, 72 (Tex. 2000) (rejecting city's Article I, § 19 claim); see also Texas Workers' Comp. Comm'n v. City of Bridge City, 900 S.W.2d 411, 414 (Tex. App.-Austin 1995, writ denied) (concluding that governmental entities cannot use Article I rights to invalidate the laws that govern them). From the foregoing authorities, we conclude that a charter school's charter is not a vested property right to which the due course of law or prohibition on retrospective laws apply, and we accordingly reject AYW's constitutional claims.
B. The Ultra Vires Claims
Both Honors and AYW complain of ultra vires conduct in the Commissioner's decision to revoke their charters. Although governmental entities and officers are generally immune from liability absent the government's waiver or consent, such immunity does not prohibit suit against a state official if the official's actions are ultra vires. See City of El Paso v. Heinrich , 284 S.W.3d 366, 372 (Tex. 2009). To state an ultra vires claim, the plaintiff must allege and prove that the named officials acted without legal authority or failed to perform a ministerial act. Hall v. McRaven , 508 S.W.3d 232, 238 (Tex. 2017). The fact that the official has some limited discretion to act under the applicable law does not preclude an ultra vires claim if the claimant alleges that the official exceeded the bounds of that authority, or the conduct conflicts with the law itself. Hous. Belt & Terminal Ry. Co. v. City of Hous. , 487 S.W.3d 154, 163 (Tex. 2016). "Ultra vires claims depend on the scope of the state official's authority," not the quality of the official's decisions. Hall , 508 S.W.3d at 234. Thus, it is not an ultra vires act for an official to make an erroneous decision within the authority granted. Id. at 242.
AYW complains that the Commissioner relied on the wrong financial accountability ratings to revoke its charter under Education Code § 12.115(c). As previously mentioned, that provision requires the Commissioner to revoke an open-enrollment charter after three unsatisfactory performance ratings. TEX. EDUC CODE § 12.115(c). AYW identifies the ultra vires act to be the Commissioner's misinterpretation of Education Code § 12.115(c-1) to refer to financial accountability ratings other than those identified by the Legislature. Honors similarly complains about the Commissioner's ultra vires conduct in using academic performance data that Honors believes Education Code § 12.115(c-1) expressly prohibited him from using.
1. The Laws Governing Charter Schools
(a) Academic & Financial Accountability Standards
The Education Code requires the Commissioner to set academic and financial accountability standards for all school districts and charter schools. Id. §§ 39.053, .082. The Code also generally describes the information the Commissioner must consider when setting those standards. Id. For example, when determining whether a school district or charter school meets academic performance standards, the Commissioner must take into account student performance on standardized tests, student improvement on those tests, the performance of students from different racial and ethnic backgrounds, and dropout and graduation rates, among other things. Id. § 39.053(c).
As part of the academic accountability standard, the Commissioner is required to assess "dropout rates, including dropout *69rates and district completion rates for grade levels 9 through 12, computed in accordance with standards and definitions adopted by the National Center for Education Statistics of the United States Department of Education ...." Id. § 39.053(c)(4)(A)(i). This requires consideration of data from previous school years. Texas law has used federal standards for dropout rates since 2003. Act of May 28, 2003, 78th Leg. R.S., ch. 805, § 1, 2003 Tex. Gen. Laws 2356, 2356-57 (originally codified in TEX. EDUC. CODE § 39.051 ).
In 2009, the Legislature required the TEA to substantially revise the academic accountability regime with the State of Texas Assessments of Academic Readiness (STAAR) testing program. Act of June 1, 2009, 81st Leg., R.S., ch. 895, 2009 Tex. Gen. Laws 2357. Although the Legislature amended many of the accountability standards, it did not alter the requirement that the Commissioner consider dropout rates in accordance with federal standards. Id. § 59, 2009 Tex. Gen. Laws 2381, 2382. Because of the substantial changes to the academic ratings system, the Legislature gave the Commissioner the option to "suspend assignment of accreditation statutes and performance ratings for the 2011-2012 school year." Id. § 59, 2009 Tex. Gen. Laws 2401-02. The Commissioner took that option, leaving school districts and charter schools without academic ratings for 2011-2012. The new academic accountability system was first used in the 2012-2013 school year.
Charter schools and school districts must also meet certain financial accountability standards. A school's financial rating is often referred to as its "FIRST" rating, an acronym for Financial Integrity Rating System of Texas. The financial rating for any given fiscal year is based on data from the prior fiscal year. At the time of the relevant events here, the Texas Administrative Code made that explicit:
The financial accountability rating for a particular year will always be based on complete and audited financial data from the previous fiscal year given the availability of the data. For example, the final 2010 School FIRST rating issued in August 2010 is based on complete and audited financial data for the 2008-2009 fiscal year and is the financial accountability rating for the 2009-1010 school year for the purposes of § 97.1055 of this title (relating to Accreditation Status).
36 Tex. Reg. 6941, 6946 (2011) (formerly 19 Tex. Admin. Code § 109.1002(i) ). The current rule similarly provides: "The TEA will base the financial accountability rating for a rating year on the data from the fiscal year preceding the rating year." 19 Tex. Admin. Code § 109.1001(k).
(b) The Commissioner's Revocation Authority
The Commissioner revoked the charters of AYW and Honors under the authority provided in Education Code § 12.115. That authority was changed by the Legislature in 2013. Before that, the Commissioner's decision to revoke an open-enrollment was discretionary. Act of May 28, 2001, 77th Leg., R.S., ch. 1504, § 12, 2001 Tex. Gen. Laws 5344, 5350 (stating that the Commissioner "may" revoke a charter). The previous legislation listed multiple conditions that might warrant revocation but the duration and severity of those conditions was left undefined. Id. (allowing revocation for "commit[ing] a material violation of the charter," "fail[ing] to satisfy accountability provisions," and "fail[ing] to comply" with the law). After the 2013 amendments, what had been discretionary with the Commissioner became mandatory.
The 2013 amendments also added a new mandatory revocation ground, which is the *70focus of this appeal. TEX. EDUC. CODE § 12.115(c). Section 12.115(c) directs the Commissioner to revoke a charter when a charter school's academic or financial performance, or any combination of the two, fall below acceptable standards "for the three preceding school years." See Id. § 12.115(c)(1) (pertaining to unacceptable academic performance rating), (c)(2) (pertaining to unsatisfactory financial accountability performance rating), (c)(3) (pertaining to any combination of these ratings). Another new provision described the initial three-year period the Commissioner was to consider when determining a school's academic and financial performance for purposes of the § 12.115(c)'s mandatory revocation. See Id. § 12.115(c-1).
2. The ultra vires claims premised on the Commissioner's application of § 12.115(c-1)
(a) Honors's claim
Because the 2011-2012 school term was a transition year for new state-mandated tests and other academic standards, the statute directed the Commissioner not to use a charter school's academic "performance during the 2011-12 school year" when determining whether to revoke a charter school's charter under subsection (c)(1) for unacceptable academics:
For purposes of revocation under Subsection (c)(1), performance during the 2011-2012 school year may not be considered. For purposes of revocation under Subsection (c)(1), the initial three school years for which performance ratings under Subchapter C, Chapter 39 [academic accreditation], shall be considered are the 2009-2010, 2010-2011, and 2012-2013 school years.
Id.
The Commissioner revoked Honors's charter because of its poor academic performance over the three-year period identified in § 12.115(c-1). Honors received an academic performance rating of "Academically Unacceptable" for 2009-2010 and 2010-2011. Honors appealed its 2009-2010 rating, but the appeal was denied. Under the revamped ratings system in 2012-2013, Honors received an academic performance rating of "Improvement Required." The poor rating was due to its failure in "Index 4," which is based, in part, on a school's dropout rate and includes data from prior years. Undisputed is that 2011-2012 data was used in calculating that index, which was part of the 2012-2013 academic accountability rating and the portion that caused Honors's poor academic rating.
The Commissioner's revocation decision was forwarded to the SOAH where an administrative law judge upheld the Commissioner's decision. The judge recognized that Honors's appeal depended on the meaning of the § 12.115(c-1)'s first sentence: "For purposes of revocation under Subsection (c)(1), performance during the 2011-2012 school year may not be considered." Honors argued that the prohibition on considering "performance during the 2011-2012 school year" meant that the Commissioner could not consider data from the 2011-2012 school year. Honors maintained that eliminating the 2011-2012 data from Index 4 of its 2012-2013 academic ratings would result in an acceptable rating that would save its charter. The Commissioner, on the other hand, contended that the prohibition on using 2011-2012 performance referred to performance ratings from 2011-2012. The administrative law judge agreed with the Commissioner's reading of the statute and ultimately concluded that the Commissioner's revocation of Honors's charter was neither arbitrary, capricious, nor clearly erroneous:
*71TEA's interpretation of the disputed sentence is consistent with the context of the rest of Texas Education Code § 12.115. The disputed sentence specifically refers to revocation under Subsection(c)(1) of § 12.115, which concerns academic performance ratings under Subchapter C of Chapter 39. This suggests that the Legislature used the word "performance in the disputed sentence as shorthand for the phrase "performance rating." The Legislature similarly used shorthand elsewhere in the section. Subsection (c)(3) uses only the word "ratings" when unambiguously referring to performance ratings described in Subsections (c)(1) and (c)(2).
For purposes of revocation, the second sentence of Texas Education Code § 12.115(c-1) requires consideration of academic performance ratings for the 2009-2010, 2010-2011, and 2012-2013 school years. The statutory directive to consider the 2012-2013, ratings could not be executed and would be ineffective if Honors's interpretation of the disputed sentence is correct. That is because 2012-2013 ratings were based on 2011-2012 performance data. In contrast, if TEA's interpretation is correct the directive to consider 2012-2013 ratings would be effective and could be executed.
Further, TEA's interpretation of the disputed sentence is consistent with the broader context of the Texas Education Code into which it was enacted. That included former Texas Education Code § 39.116, which authorized the Commissioner to suspend assignment of performance ratings for the 2011-2012 school year during the period of transition to the accreditation system implemented in August 2013. Exercising his authority, the Commissioner did not issue accountability ratings for any school during the 2011-2012 school year. Apparently because the Commissioner was not required to rate academic performance during the 2011-2012 school year, § 39.116 prohibited revocation based on academic ratings for that year.
TEA v. Honors Academy , SOAH Docket No. 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 (May 20, 2014).
Honors contends here again that the Commissioner has misinterpreted his authority under the statute, urging that the use of performance data from the 2011-2012 school year represents a " 'manifest, conspicuous and irreconcilable conflict' " with the prohibition found in Education Code § 12.115(c-1). See Morath v. Sterling City Indep. Sch. Dist. , 499 S.W.3d 407, 413 (Tex. 2016) (plurality op.) (quoting Klumb , 458 S.W.3d at 10-11 ).
The Commissioner responds that interpreting the statute is within his authority. Moreover, even if the statute is ambiguous, the Commissioner submits that his interpretation must prevail, not only because it is more reasonable, but also because the enabling statute makes his determination in the matter final. Certainly, the Commissioner concludes, his interpretation is not "inherently," "patently," or "manifest[ly]" contrary to the statute-the standard Honors must meet to avoid the finality the statute prescribes. See Klumb , 458 S.W.3d at 10. We agree that the Commissioner's interpretation of the statute is not ultra vires.
Over the past decade, the Legislature has sought to keep the Commissioner's decisions regarding academic and financial accountability ratings and charter revocations out of the courts. In 2009, the Legislature required the Commissioner, by rule, to provide a process for a school district or charter school to challenge its academic and financial accountability ratings. Act of June 1, 2009, 81st Leg., R.S., ch. 895, § 59, 2009 Tex. Gen. Laws 2357, 2402 (codified *72at TEX. EDUC. CODE § 39.151 ); see also 19 Tex. Admin. Code § 97.1001(a)(4) (providing that the TEA will publish a manual that includes the procedures for submitting a rating appeal). The statute mandated that the Commissioner appoint a committee to make recommendations to the Commissioner regarding appeals. TEX. EDUC. CODE § 39.151(b). The statute further provided that the Commissioner's ultimate decision was final and not subject to further appeal. Id. § 39.151(d).
Similarly, the Legislature has insulated the Commissioner's revocation decisions from judicial review. Id. §§ 12.115-.116. An appeal is permitted to the SOAH, but the appeal is not a contested-case hearing nor is it subject to the Administrative Procedure Act. Id. § 12.116(b). Instead, an administrative law judge reviews the Commissioner's revocation decision under an "arbitrary and capricious or clearly erroneous" standard, and the judge's determination is final; it is not subject to judicial review. Id. § 12.116(c).
The finality accorded the Commissioner's determinations here thus implicates our recent decision in Morath v. Sterling City Independent School District , another case involving an administratively final decision by the Commissioner of Education. That case concerned Education Code § 42.2516, which at the time required the Commissioner to reduce state aid to school districts that experience an increase of local revenue from three specified sources. Sterling City , 499 S.W.3d at 410. The statute also provided that the Commissioner's determination was final and could not be appealed. Id. For two years, the Commissioner reduced state aid to three school districts because of local-revenue increases from sources not listed in § 42.2516. Id. at 410-11. The school districts filed an ultra vires suit, alleging that the Commissioner exceeded his authority in making the reductions. Id. at 411. The trial court granted the school districts declaratory relief, and the court of appeals affirmed. Williams v. Sterling City Indep. Sch. Dist. , 447 S.W.3d 505 (Tex. App.-Eastland 2014, pet. granted).8
This Court, in a divided decision, reversed the court of appeals' judgment and dismissed the case for want of jurisdiction. Sterling City , 499 S.W.3d at 408. A plurality of the Court concluded that the statute's finality provision precluded judicial review. Id. at 414. The plurality observed that the Texas Constitution specifically allows the Legislature to shape the judiciary's jurisdiction and that, absent a violation of constitutional or vested property rights, the Legislature has the authority to limit judicial review of an executive official's action. Id. at 412 (citing TEX. CONST. art. V, § 8 ). The plurality also recognized that the Court in Klumb had assumed, but not decided, that an ultra vires claim could arise despite a finality provision, if an official's actions produced a conspicuous or irreconcilable conflict with the enabling statute, while also noting that the Court had yet to see such a case. See Id. at 413 ("The Court has never allowed a challenge to an executive decision made final by statute."). A fifth member of the Court concurred in the judgment, concluding that the standard for pleading a cognizable ultra vires claim is necessarily higher when a finality provision shields an official's decision from judicial review and that the Commissioner's decision here did not present an irreconcilable conflict as hypothesized in Klumb , 499 S.W.3d 414-16 (Brown, J. concurring).
*73The Court said in Klumb that a pension statute's textual breadth, combined with its textual bar on judicial review, gave the pension board virtually unlimited discretion in interpreting and applying pension law absent a conspicuous and irreconcilable conflict. Klumb , 458 S.W.3d at 11. In Sterling City , the plurality stated that the effect of a finality provision was "to broaden the executive's discretion," indicating the intention to make the official's determination virtually absolute. Sterling City , 499 S.W.3d at 413. Under either formulation, Honors's complaint regarding the Commissioner's interpretation of his authority under § 12.115 is insufficient to support judicial intervention in derogation of the finality provision.
(b) AYW's claim
The Commissioner also revoked AYW's charter under the authority of § 12.115(c). AYW's charter revocation, however, was not because of its academics, as was the case with Honors's revocation, but rather because of its financials. AYW received a financial rating of "Substandard Achievement" for school years 2010-2011, 2011-2012, and 2012-2013.9 And although § 12.115(c-1) excluded the 2011-2012 school year when considering revocation for unacceptable academics under § 12.115(c)(1), it did not also exclude that school year when considering revocation for unacceptable financial performance under § 12.115(c)(2). TEX. EDUC. CODE § 12.115(c)(1)-(2), (c-1). The new academic standards that made the 2011-2012 school term a transition year for rating academic performance did not significantly affect financial performance ratings and thus § 12.115(c-1) stated that "the initial three school years for which financial accountability performance ratings under Subchapter D, Chapter 39, shall be considered are the 2010-2011, 2011-2012, and 2012-2013 school years." Id. § 12.115(c-1).
As already noted, the Commissioner notified AYW of his intention to revoke AYW's charter based on its unacceptable financial ratings and advised AYW of its right to an informal review by written request. AYW appealed the revocation decision through the informal procedure, but the Commissioner determined that he would proceed with the revocation. AYW's appeal was then forwarded to the SOAH, which issued a hearing notice. Rather than pursue the SOAH hearing,10 AYW filed suit in district court, where it obtained the temporary injunction, which is the subject of this appeal.
AYW's ultra vires complaint is similar to Honors's in that it complains that the Commissioner used the wrong data when revoking its charter. The disagreement here is over whether a school's financial accountability performance rating (or FIRST rating) for any particular school year refers to the school year in which the financial data is collected or the year in which the data is compiled and a rating announced. By rule, a school's financial rating for any given fiscal year is based on data from the prior fiscal year. See 19 Tex. Admin. Code § 109.1001(k) ; see also 36 Tex. Reg. 6941, 6946 (2011) (formerly 19 Tex. Admin. Code § 109.1002(i) ).
AYW argues that, despite this regulation, the TEA's website indicated something different. For example, according to AYW, "the financial accountability rating based on performance during the 2011-2012 year was called the '2011-2012 Charter School Status Detail' and accessed by *74selecting the '2011-2012' year in the TEA dropdown menu." From this, AYW concludes the financial accountability rating for any particular school year should be based on performance data from that year rather than from the preceding school year. AYW further submits that, by identifying the initial three school years that could be considered for a charter revocation under § 12.115(c)(2), the Legislature prohibited the use of financial data collected before the 2010-2011 school term, the earliest identified school term. See TEX. EDUC. CODE § 12.115(c-1). AYW then concludes that the Commissioner acted beyond his authority by basing AYW's 2010-2011 financial performance rating on data collected during the preceding 2009-2010 school year, rather than during the year of performance. According to AYW, if the Commissioner had used the correct data from the performance year, its charter school would not have had three consecutive years of unacceptable financial ratings because data collected during the 2012-2013 school year produced a sufficient financial performance rating. And if AYW did not have three consecutive unacceptable financial ratings, its charter would not have been subject to mandatory revocation under § 12.115(c)(2).
The Commissioner responds that he used the appropriate financial ratings for the school years identified in section 12.115(c-1) and that his actions were not ultra vires, but rather required by law. See id. § 12.115(c)(2). True, the annual financial ratings were based on prior-year data, but that was known to all because of the rule. See Acker v. Tex. Water Comm'n , 790 S.W.2d 299, 301 (Tex. 1990) (noting the presumption that Legislature knows the existing law when it enacts a statute). Thus, when the Legislature referred to financial ratings for certain years in § 12.115(c-1), it knew that those ratings were based on data from the prior year. Finally, the Commissioner submits that, under applicable law, his authority in the matter is broad and his decisions insulated from de novo review. See id. § 12.116(c)(1) (stating that an administrative law judge "shall uphold" the Commissioner's decision unless it is "arbitrary and capricious or clearly erroneous"); see also id. § 12.116(c)(2) (providing that the administrative law judge's decision is "final and may not be appealed").
As already discussed, when the Legislature makes an executive decision final and unappealable, a plaintiff may not obtain reversal of that decision through an ultra vires action unless the decision presents a "manifest conflict with express statutory terms." Klumb , 458 S.W.3d at 10. "Absent a conspicuous and irreconcilable conflict" with the statute, any review of the Commissioner's revocation decision encroaches on the Commissioner's authority and the finality the statute accords his decisions. See Id. at 11 ; see also Sterling City , 499 S.W.3d at 413. The disagreement here regarding the interpretation of § 12.115(c-1) suggests the existence of an ambiguity rather than the "conspicuous and irreconcilable conflict" assumed to be the standard in our prior decisions. We therefore conclude that the Commissioner's interpretation was within his authority and that his application of § 12.115(c) was not an ultra vires act.
3. Ultra vires claims premised on Commissioner's rule-making authority
AYW's remaining ultra vires claims concern the Commissioner's rule-making authority and parts of former rule 109.1002. See 19 Tex. Admin. Code § 109.1002 (2013). As discussed, the Legislature has required the Commissioner to provide an informal process for school districts and charter schools to challenge academic and financial ratings. See *75TEX. EDUC. CODE § 39.151(a). The Legislature further requires the process to include the appointment of a committee to review appeals and allows the Commissioner to limit challenges to written submissions. Id. § 39.151(b), (c).
AYW asserts that the Commissioner acted beyond this authority in promulgating rule 109.1002 because the rule restricts the informal review process for accountability ratings to a greater extent than the enabling statute. For example, when describing the informal process, the Education Code states that the "commissioner may limit a challenge under this section to a written submission of any issue identified by the ... open-enrollment charter school challenging the agency decision." Id. § 39.151(c). AYW complains that the Commissioner's rule is far more limiting because it does not provide for "a written submission of any issue." Id. The rule instead states: "A district or open-enrollment charter school may submit a written appeal requesting that the TEA review a preliminary rating if the preliminary rating was based on a data error solely attributable to the TEA's review of the data for any of the indicators." 19 Tex. Admin. Code § 109.1002(i)(2). Because the Education Code contemplates a written appeals process for all financial accountability ratings, and the administrative rule restricts such appeals to errors solely attributable to TEA's financial data, AYW complains that the Commissioner has placed an unauthorized limitation on ratings appeals in conflict with the enabling statute.
The "unauthorized limitation" did not prevent AYW from raising this same issue in the informal appeal of its 2013 Charter FIRST rating, however. In its written appeal, AYW also raised several data entry errors attributable to TEA as well as a reporting mistake on its part. AYW further criticized the "inherent shortcoming in the Current FIRST rating methodology" which "does not correctly measure the School's financial oversight and provide meaningful information to enable the Commissioner of Education and the School to improve financial operations," concluding that "[a]ll FIRST indicators constitute data errors attributable to TEA." As required by rule, an external independent appeals panel reviewed AYW's written appeal and advised the Commissioner on the ratings-appeal decision. See 19 Tex. Admin. Code § 109.1002(i)(2)(A) (2013) ; see also TEX. EDUC. CODE § 39.151(b) (requiring such review). The record does not include the panel's conclusions or recommendations, but after receiving the panel's advice, the Commissioner denied AYW's appeal.
In this collateral attack on the Commissioner's decision, AYW frames the rule limiting the rating appeal's content as an ultra vires act. AYW further submits that the finality accorded the Commissioner's decision, see TEX. EDUC. CODE § 39.151(d), is not a limitation here because the ultra vires rule denied AYW an opportunity to challenge the decision under this section, see Id. § 39.151(e).
The court of appeals, however, viewed the data-error-entry rule as "logical given that the ratings result from a score that is based on the answers supplied in response to multiple objective questions, which in turn, reflect 'financial measurements, ratios, other indicators established by the commissioner.' " 496 S.W.3d at 263. Moreover, the court noted that AYW had two opportunities to contest a financial rating, first at the time the rating issued and again after notice of the Commissioner's intent to revoke its charter. Id. at 262-63. As regards the latter opportunity, the Education Code provided at the time that the Commissioner was to "adopt an informal *76procedure to be used for revoking the charter of an open-enrollment school." Act of May 26, 2013, 83d Leg., R.S., ch. 1140, § 26, 2013 Tex. Gen. Laws 2760, 2772.11
The Commissioner's letter, notifying AYW of his intent to revoke, identified the three unacceptable financial performance ratings and the one unacceptable academic performance rating, which formed the basis for his decision to revoke under § 12.115(c). The letter also notified the charter school of its right to request an informal review and hearing regarding the Commissioner's decision but that the request had to be in writing with answers to the findings in the notice. AYW pursued the informal review, submitting a written response that in many respects tracks its briefing in this Court. For example, AYW asserted that the Commissioner and TEA had misinterpreted and misapplied the relevant rating years identified in § 12.115(c-1), had engaged in arbitrary rule making and enforced arbitrary rules, and arbitrarily neglected to consider certain extenuating circumstances relevant to AYW's poor performance ratings. As examples of these extenuating circumstances, AYW complained about the Texas Education Agency
• causing one of its campuses to acquire an unacceptable academic rating by requiring its merger with another poorly performing campus instead of accepting AYW's request to merely close the underperforming campus;
• arbitrarily assigning AYW an unacceptable financial rating for one year merely because AYW's auditors were late in submitting their audit;
• failing to consider the vast improvements experienced at the charter school because the TEA's "FIRST" measuring tool lacked flexibility;
• failing to consider that AYW's assets appeared to be significantly less than they actually were because of its board's decision to create a 501(c)(2) tax-exempt entity to hold property and support the charter school and the 501(c)(3) entity that held the charter;
• failing to reconsider AYW's high staff-to-student ratio by discounting those staff members who were in contact with students but not supported or paid with charter school funds;
• failing to consider the endowment held by AYW's supporting 501(c)(2) entity even though the 501(c)(3) entity that controlled AYW had instant access to $600,000 of that endowment; and
• failing to consider the significant amounts of interest earned by the endowment held by the 501(c)(2) and paid to support AYW.
AYW asserted that reconsideration of one or more of these extenuating circumstances would affect its performance ratings and remove its charter from jeopardy under § 12.115(c). AYW's written response to the revocation notice also raised its constitutional claims and concluded by reserving "its right to supplement and modify this response and to avail itself of all avenues of appeal and opposition to this revocation and closure effort including but not limited to an informal review."
The Commissioner conducted an informal review of AYW's response and determined *77that revocation would proceed, subject to AYW's right to appeal his decision to the SOAH. A SOAH hearing was scheduled, but the hearing was postponed after AYW filed suit in district court.
The two administrative appeals regarding AYW's financial rating and subsequent charter revocation indicate that AYW had the opportunity to raise these issues. In neither appeal did the Commissioner reject AYW's written submissions or refuse to consider the issues raised in them. AYW's complaint is not about the rule's application but about what the Commissioner considers most important in these appeals. When reviewing one of his decisions, the Commissioner apparently focuses on mistakes made by his agency in compiling the data used to support his decision. The process may not be as transparent as the charter school would like,12 but it is not ultra vires.
The Legislature requires the Commissioner to set the academic and financial accountability standards that all districts and charter schools must meet. TEX. EDUC. CODE § 39.053, .082. The Legislature has also generally described the information the Commissioner must consider when setting those standards. Id. The Legislature further requires the Commissioner, by rule, to provide a process for a district or charter school to challenge its academic and financial ratings. Id. § 39.151. The Commissioner must appoint a committee to make recommendations to him on challenges to agency decisions. Id. § 39.151(b). The ultimate decision, however, belongs to the Commissioner, and his decision is final and cannot be appealed. Id. § 39.151(d).
At the time AYW received the financial ratings at issue, the administrative rules provided that an "open-enrollment charter school may submit a written appeal requesting that the TEA review a preliminary rating if the preliminary rating was based on a data error solely attributable to the TEA's review of the data for any of the indicators." 36 Tex. Reg. 6946 (formerly rule 109.1002(i)(2) ). Under the current rule, an open-enrollment charter "may appeal any adverse issue it identifies in the preliminary [financial] rating." 19 Tex. Admin. Code § 109.1001(l)(3). The current rule cautions, however, that "the financial accountability rating system is required to apply the rules uniformly" and that "[a] request for an exception to the rules ... is disfavored and likely to be denied." Id.
The Commissioner also has authority to revoke open-enrollment charters and must do so under certain circumstances. See TEX. EDUC. CODE § 12.115. The Legislature has required the Commissioner to adopt an informal procedure for the review of his revocation decisions. Id. § 12.116(a). These decisions are also reviewed by the SOAH and may be reversed if the Commissioner's "decision is arbitrary and capricious or clearly erroneous." Id. § 12.116(c). Once the Commissioner revokes the charter, the school may not "continue to operate" or "receive state funds." Id. § 12.1161.
The Commissioner thus has broad authority over the creation and regulation of open-enrollment charters. His authority to revoke existing charters may be more circumscribed, but this is primarily because under current law his actions here are frequently mandated.
We conclude that the authority exercised by the Commissioner over AYW's charter complies with that granted to him by the Legislature and was therefore not ultra vires. Whether the Commissioner's *78decision to revoke AYW's charter was arbitrary, capricious or clearly erroneous is not for us to decide. That appeal lies with the SOAH and its decision is made final by law. Id. § 12.116(c).
* * * * *
The Texas Education Code empowers the Commissioner of Education to create open-enrollment charter schools, regulate them, and make decisions that effect their existence through reviews, renewals, and revocations. Many of the Commissioner's executive decisions, including those at issue here, are made final or permit only limited administrative review. Because the enabling statutes precluded judicial review of these executive decisions and no basis existed otherwise to invoke the district court's inherent authority, the court of appeals concluded that sovereign immunity barred the district court proceedings. The appellate court accordingly vacated the district court's temporary injunctions and dismissed the underlying proceedings for want of jurisdiction.
Because we agree that the charter schools have no vested property right in public education or their respective charters and have failed to demonstrate the existence of any ultra vires act in the revocation of their charters, we affirm the court of appeals' judgment.
Justice Johnson filed a concurring opinion.
Justice Blacklock did not participate in the decision.
I agree with and join the Court's opinion and judgment, subject to the following comments.
The Court makes extensive references to LTTS Charter School, Inc. v. C2 Construction, Inc. , where we considered whether an open-enrollment charter school was a "governmental unit" for purposes of the Tort Claims Act, and therefore authorized to take an interlocutory appeal from the trial court's denial of its plea to the jurisdiction. 342 S.W.3d 73, 74-75 (Tex. 2011). The Court notes that after we decided LTTS , the Legislature "expanded charter-school immunity to include immunity from suit and added charter holders to the immunity granted." Ante at 65 (citing TEX. EDUC. CODE § 12.1056(a) ).
In LTTS , we did "not resolve the underlying issue of whether [the school] enjoys immunity" and did not otherwise address the question of charter school immunity. 342 S.W.3d at 82. The dissenting justice in LTTS noted that the issue of whether the Legislature had authority under the Texas Constitution to confer immunity on a private entity was far from clear. Id. at 89 (Guzman, J., dissenting) ("[T]he precise contours of the Legislature's power to grant immunity by statute remain unclear-it is no doubt limited by the Open Courts and Due Course of Law provisions of our Constitution."). As this Court has explained numerous times, the doctrine of sovereign immunity, or governmental immunity as it is referred to in connection with political subdivisions of the state, developed through the common law. That being so, the judiciary "has historically been, and is now, entrusted with 'defin[ing] the boundaries of the common-law doctrine and ... determin[ing] under what circumstances sovereign immunity exists in the first instance.' " Wasson Interests, Ltd. v. City of Jacksonville , 489 S.W.3d 427, 432 (Tex. 2016) (quoting Reata Const. Corp. v. City of Dallas , 197 S.W.3d 371, 375 (Tex. 2006) ). On the other hand, courts have consistently deferred to the Legislature to decide if and when immunity should be waived because "the Legislature is better suited to balance the conflicting policy issues *79associated with waiving immunity." Wichita Falls State Hosp. v. Taylor , 106 S.W.3d 692, 695-96 (Tex. 2003).
Whether the Texas Constitution authorizes the Legislature to grant sovereign or governmental immunity to an entity is a question warranting full and transparent presentation and analysis-especially in light of our extensive and consistent prior statements and decisions. See, e.g. , Univ. of the Incarnate Word v. Redus , 518 S.W.3d 905, 911 (Tex. 2017) ; Wasson Interests , 489 S.W.3d at 432 ; Brown & Gay Eng'g, Inc. v. Olivares , 461 S.W.3d 117, 121 (Tex. 2015) ; Reata Const. Corp. , 197 S.W.3d at 375. That the question, an issue of obvious great magnitude, has not been presented or decided in this case is manifested both by the Court's brief and passing references to section 12.1056(a)'s immunity language and the lack of any discussion or analysis regarding the constitutionality question.

See Sunset Advisory Comm'n, Final Report with Legislative Action: TEA 69-82 (July 2013), available at https://www.sunset.texas.gov/reviews-and-reports/agencies/ texas-education-agency-tea.

Id. at 72.

Id.

Id. at 79.

Board refers to the Texas State Board of Education, whose 15 members are elected from single-member districts throughout the State. See Tex. Educ. Code § 7.101.

The TLCCS is a 501(c)(3) nonprofit corporation consisting of more than 30 independent Texas charter schools.

The TCSA is a statewide nonprofit membership association, representing over 80% of open-enrollment charter schools in Texas.

During the appeal, Mike Morath replaced Michael Williams as Commissioner of Education.

AYW also received an academic performance rating of "Academically Unacceptable" for 2010-2011.

The record does not reflect what became of AYW's SOAH appeal.

In 2015, after the revocation at issue here, the Legislature again amended § 12.116. These amendments require the adoption of an informal procedure that "allow[s] representatives of the charter holder to meet with the commissioner to discuss the commissioner's decision" and further "allow[s] the charter holder to submit additional information to the commissioner relating to the commissioner's decision," after which "the commissioner shall provide a written response to any information" submitted. Tex. Educ. Code § 12.116(a) -(a-1).

The process has become more transparent since the revocation of AYW's charter. See n.11 supra .