ACCEPTED
15-24-00101-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
1/17/2025 3:56 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00101-CV

# In the Court of Appeals
## for the Fifteenth Judicial District

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
1/17/2025 3:56:24 PM
CHRISTOPHER A. PRINE
Clerk

MIKE MORATH, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF EDUCATION,

*Appellant*,

*v.*

PECOS-BARSTOW-TOYAH INDEPENDENT SCHOOL DISTRICT, ET AL.,

*Appellees.*

On Appeal from the
201st Judicial District Court, Travis County

## REPLY BRIEF FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

BETH KLUSMANN
Assistant Solicitor General
State Bar No. 24036918
Beth.Klusmann@oag.texas.gov

Counsel for Appellant

# Table of Contents

Page

Index of Authorities ................................................................................i

Introduction ........................................................................................ 1

Argument ............................................................................................ 2

I. Plaintiffs Are Not Entitled to a Temporary Injunction. ........................... 2

A. Because Plaintiffs' claims are likely to fail on the merits, the trial court abused its discretion in issuing a temporary injunction. ................................................................. 2

1. The Commissioner lawfully administered the STAAR test. ......... 3

a. TTAC, an independent entity, properly determined that the STAAR test is valid and reliable. .............................. 4

b. The STAAR test is valid and reliable. ..................................... 8

2. The Commissioner provided all required notice. ........................ 13

3. The Commissioner's method of evaluating districts did not make it mathematically impossible for Plaintiffs to earn A. ......... 18

B. Plaintiffs have not shown imminent, irreparable harm. ...................... 21

II. Because Plaintiffs Failed To Establish a Viable *Ultra Vires* Claim, Sovereign Immunity Bars Their Suit. ....................................... 24

Prayer ............................................................................................... 27

Certificate of Compliance ...................................................................... 27

# Index of Authorities

Page(s)

**Cases:**

*Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*,
610 S.W.3d 911 (Tex. 2020) ...................................................... 2, 3, 21

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002) ............................................................ 2, 21

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ..........................................................17, 18

*Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1,*
    669 S.W.3d 178 (Tex. 2023)......................................................... 16

*Honors Acad., Inc. v. TEA,*
    555 S.W.3d 54 (Tex. 2018)...........................................................20

*Matzen v. McLane,*
    659 S.W.3d 381 (Tex. 2021) ...............................................2-3, 24

*Morath v. Lampasas ISD,*
    686 S.W.3d 725 (Tex. 2024) ....................................................... 17

*Morath v. Tex. Taxpayer & Student Fairness Coal.,*
    490 S.W.3d 826 (Tex. 2016) .......................................................23

*Rattray v. City of Brownsville,*
    662 S.W.3d 860 (Tex. 2023) .......................................................24

*Rollins v. Pressler,*
    623 S.W.3d 918 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) .................8

*State v. Loe,*
    692 S.W.3d 215 (Tex. 2024)...........................................................2

*State v. Roland,*
    973 S.W.2d 665 (Tex. 1998) ........................................................ 18

*In re State,*
    No. 24-0325, 2024 WL 2983176 (Tex. June 14, 2024)...........................2

*In re Stetson Renewables Holdings, LLC,*
    658 S.W.3d 292 (Tex. 2022) ........................................................ 17

*TEA v. Houston ISD,*
    660 S.W.3d 108 (Tex. 2023) .................................................... 8, 25

*Town of Shady Shores v. Swanson,*
    590 S.W.3d 544 (Tex. 2019)........................................................25

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................... 21

**Statutes and Rules:**

Tex. Educ. Code:
    § 4.001(b) ...................................................................... 20, 26
    § 39.023(a-11) ...............................................3, 4, 5, 6, 7, 8, 24, 25
    § 39.023(a-14) .......................................................................4
    § 39.02302(a).......................................................................3, 4

Tex Educ Code:

§ 39.054(a) .................................................................................. 2, 15, 17

§ 39.054(a-3) ...................................................................................... 2, 17

§ 39.054(a-4) ........................................................................................... 18

§ 39.054(b) ................................................................................... 18, 19, 26

§ 39.0541 .................................................................................................. 16

§ 39.0542 ................................................................... 13, 14, 15, 18, 26

§ 39.0542(a) .................................................................... 13, 14, 16, 17

§ 39.0542(b) ............................................................................................ 13

§ 39.151(d) ............................................................................................... 23

§ 39A.907 ...................................................................................................6

19 Tex. Admin. Code § 97.1001 ................................................................ 15

**Other Authorities:**

48 Tex. Reg. 6593 (Nov. 10, 2023) ........................................................... 23

49 Tex. Reg. 3280 (May 10, 2024) .............................. 14, 15, 16, 23, 25

Act of May 31, 2015, 84th Leg., R.S., ch. 1006,
    2015 Tex. Gen. Laws 3554 ...................................................................6

# INTRODUCTION

Plaintiffs' brief only confirms the extraordinary nature of their claims. Supported by little more than supposition and innuendo, Plaintiffs ask this Court to conclude that the STAAR test is invalid and unreliable, eliminate accountability ratings based on a deadline found nowhere in statute, and require the Commissioner to lower state standards regarding how well schools are preparing students for life after high school. But their claims that the Commissioner acted *ultra vires* lack evidentiary and legal support. And nothing in the Education Code suggests that the Legislature intended the courts to resolve these claims (had they any merit) by eliminating accountability ratings.

Plaintiffs' litigation strategy of waiting until the last minute to bring claims that they've known about for months demonstrates that their goal is not accountability but the avoidance of it. Indeed, thus far, Plaintiffs' lawsuit has prevented the public from learning exactly how well (or poorly) their schools are performing. And it has prohibited the Commissioner from implementing the constitutionally necessary accountability regime. The Court should not countenance even more delayed accountability based on flimsy allegations brought by only a handful of districts.

Plaintiffs' concern they will not receive a high accountability rating is not the result of any *ultra vires* act of the Commissioner and not a reason to prohibit him from issuing ratings. The Court should reverse the grant of the temporary injunction and render judgment dismissing Plaintiffs' claims for lack of jurisdiction.

## I. Plaintiffs Are Not Entitled to a Temporary Injunction.

Plaintiffs briefly argue (at 32) that the temporary injunction is appropriate because it merely maintains the status quo. It does not. The status quo would have been to allow the Commissioner to issue accountability ratings as the Legislature has obligated him to do. *See* Tex. Educ. Code § 39.054(a), (a-3). Nor would maintenance of the status quo alone justify injunctive relief: As explained by the Supreme Court, Plaintiffs must prove (1) a cause of action, (2) a probable right to relief, and (3) a probable, imminent, and irreparable injury. *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)). Plaintiffs satisfy none of these elements, and their assertion that enjoining the Commissioner from fulfilling his statutory duty to release accountability ratings is somehow "maintaining the status quo" is insufficient to warrant injunctive relief, even temporarily.

### A. Because Plaintiffs' claims are likely to fail on the merits, the trial court abused its discretion in issuing a temporary injunction.

To establish their probable right to relief, Plaintiffs must demonstrate that their claims will "probably succeed on the merits." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 917 (Tex. 2020) (per curiam); *cf. In re State*, No. 24-0325, 2024 WL 2983176, at *2 (Tex. June 14, 2024) (orig. proceeding) ("There is little justice in allowing a party who will very likely lose on the merits to interfere with the legal rights of the opposing party during the appeal, if this can be avoided."). In this *ultra vires* suit, the ability to succeed plays double duty: Without a viable *ultra vires* claim, sovereign immunity bars Plaintiffs' lawsuit, *Matzen v.*

*McLane*, 659 S.W.3d 381, 388 (Tex. 2021), eliminating both jurisdiction and any chance of success on the merits.

Here, Plaintiffs are not only *unlikely* to succeed, they *will* not succeed. First, Plaintiffs' primary claim—that no independent entity properly reviewed the STAAR test, rendering it invalid and unreliable—is contrary to the law and the facts. Further, Plaintiffs have not identified a single test question that is flawed, performed any analysis of the test themselves, or explained how the conclusions of multiple experts that the STAAR test is valid and reliable are erroneous. Second, their claim that the Commissioner did not provide the statutorily required notice of accountability standards is defeated by Plaintiffs' own evidence and the fact that the 2024 Accountability Manual was adopted during the 2023-2024 school year. And third, Plaintiffs' claim that they cannot earn an A on the CCMR component does not demonstrate a statutory violation but rather reflects Plaintiffs' own choices. Because Plaintiffs have not demonstrated a viable *ultra vires* claim, sovereign immunity bars their lawsuit, a probable right to relief is lacking, and a temporary injunction is unavailable. *See Anti-Defamation League*, 610 S.W.3d at 917.

### 1. The Commissioner lawfully administered the STAAR test.

Plaintiffs' claim concerning the STAAR test is twofold. First, they raise a procedural challenge—that no independent entity has determined the STAAR test to be valid and reliable. Tex. Educ. Code § 39.023(a-11). And second, they argue that, because of this lack of review, the STAAR test is not, in fact, valid and reliable. As for the first, the Texas Technical Advisory Committee (TTAC) reviews the STAAR test for validity and reliability. *Id.* § 39.02302(a). And as for the second, not a shred

of evidence supports it. The Commissioner committed no *ultra vires* act with respect to the STAAR test that would warrant the elimination of accountability ratings.

### a. TTAC, an independent entity, properly determined that the STAAR test is valid and reliable.

**i.** Statutory construction demonstrates that review by TTAC satisfies section 39.023(a-11)'s requirement that the STAAR test be "determined to be valid and reliable by an entity that is independent of the agency and of any other entity that developed the assessment instrument." As provided by section 39.02302(a), TTAC "advise[s] the commissioner and the agency regarding the development of valid and reliable assessment instruments." And the Legislature understood that TTAC would make "findings and recommendations" regarding whether the STAAR test is "valid and reliable." *Id.* § 39.023(a-14). In other words, there must be an independent entity that determines the test is valid and reliable, and TTAC (whose members are independent of TEA) both advises and makes findings and recommendations regarding validity and reliability. TTAC therefore fulfills the independent-entity requirement, as confirmed by testimony from its members. 2.RR.88-89, 91, 149.

Plaintiffs' counterarguments do not call this conclusion into question.

*First*, Plaintiffs assert (at 22-23) that TTAC cannot be "independent" because it helps develop the STAAR test. But Plaintiffs mistake offering advice during the development process—whether that process will produce a valid and reliable assessment—with developing the test itself. Testimony from the hearing confirmed that TTAC plays no role in actually developing the STAAR test. 2.RR.122-23 ("[TTAC] had nothing to do with the actual development of the items that are on the STAAR

4

nor the development of the scoring approach, the automated scoring approach, which was developed by Cambium and Pearson."); 3.RR.68 ("[TTAC] do[es] not develop the assessment instrument. The assessment instrument is developed by our vendors, as well as TEA.").

TTAC's role is no different than that of HumRRO, the independent contractor that performed a validity study of the STAAR test in 2016, which Plaintiffs uphold as the gold standard. 4.RR.950-1018.[1] HumRRO looked at the processes TEA had in place, as well as the resulting STAAR test, and concluded that the STAAR test was valid and reliable. 4.RR.954 (stating that HumRRO's review "focuse[d] on whether the procedures support the creation of valid and reliable assessment scores."), 1007 (concluding that TEA's processes "allow for the development of tests that yield valid and reliable assessment scores"). TTAC undertakes a similar analysis on a less formal basis. TTAC advises TEA on the development and implementation of the STAAR test, reviews the results of the administration of the test, suggests improvements, and reviews all changes made to the STAAR test, as well as its implementation and outcomes. 2.RR.89, 101-02. That TTAC's advice comes *during* the development process—which is constantly ongoing—does not mean TTAC itself develops the test.

*Second*, Plaintiffs argue (at 23) that the Legislature would have just said "TTAC" in section 39.023(a-11) if TTAC was the entity it intended to fulfill that

---

[1] Volume 4 of the reporter's record has stamped page numbers that differ from the PDF page number. As with the Commissioner's opening brief, this brief refers to the PDF page numbers.

role. But the Legislature left room for the Commissioner to exercise his discretion: While TTAC can fulfill that role, the Commissioner is free to contract with another independent entity if he so chooses.

In sum, TTAC is an independent entity that determines whether the STAAR test is valid and reliable. The Commissioner has therefore committed no *ultra vires* act under section 39.023(a-11) either in administering the STAAR test or using its results to calculate accountability ratings.

**ii.** Assuming that TTAC may satisfy the independent-entity role in section 39.023(a-11), Plaintiffs next assert (at 24-25) that TTAC simply has not performed the required analysis. Plaintiffs point to testimony that, because the TEKS (that is, the content required to be taught in each subject) have changed since 2016, the 2016 validity study performed by HumRRO no longer applies. As an initial matter, the Education Code does not require a "study" but only that an independent entity "determine[]" that the test is valid and reliable. Tex. Educ. Code § 39.023(a-11). In its opening brief, the Commissioner identified past examples of when the Legislature explicitly required a study, demonstrating that it knows how to enact such a requirement. *Id.* § 39A.907; Act of May 31, 2015, 84th Leg., R.S., ch. 1006, § 2, 2015 Tex. Gen. Laws 3554, 3554-55. Plaintiffs provide no response and identify no similar language in section 39.023(a-11). Thus, the lack of a formal study does not demonstrate any *ultra vires* conduct by the Commissioner.

More substantively, Plaintiffs' argument rests on a colloquy with one of TTAC's members about a content-validity study, which TTAC has not performed. 2.RR.127-33. In short, the 2016 HumRRO study included an analysis of whether the

6

content of the questions on the STAAR test aligned with what was supposed to be taught in classrooms (the TEKS). 4.RR.954 (Task 1). Because the TEKS have been updated since then, Plaintiffs assert another formal content-validity study must be done.

But there is no statutory requirement regarding exactly what elements must be part of any validity determination under section 39.023(a-11). The Commissioner therefore has the discretion to conclude that the validity and reliability determinations made by TTAC suffice, notwithstanding what HumRRO may have done in the past. And regardless, every question on the STAAR test has been reviewed for alignment with TEKS by a committee of teachers—all of whom are independent of TEA. 3.RR.52, 75. Plaintiffs have not called into question the determinations of those Texas educators, nor have they identified any question that does not align with the TEKS.

Plaintiffs' position appears to be that every time the TEKS are updated, TEA must hire an independent contractor to perform a validity study. But section 39.023(a-11) is not that specific and does not contain that requirement. Multiple experts and entities review the STAAR test to ensure that it validly and reliably demonstrates how well Texas students are learning. The Commissioner has not committed an *ultra vires* act by concluding that these processes satisfy his obligation under section 39.023(a-11).

**iii.** Plaintiffs' *ultra vires* claim also fails because Plaintiffs cannot demonstrate that the Legislature intended courts to eliminate all accountability ratings simply because the Commissioner failed to check the independent-entity box—either because

TTAC was not sufficiently independent or because its review did not go far enough. Indeed, Plaintiffs identify no statutory connection between the independent-entity requirement and the Commissioner's authority to issue ratings.

Moreover, Plaintiffs' suit comes too late, as section 39.023(a-11) expressly requires the validity-and-reliability review to come "[b]efore" the STAAR test is "administered." Tex. Educ. Code § 39.023(a-11). Plaintiffs knew from the *Kingsville* litigation in the fall of 2023 that the Commissioner considers review by TTAC to be sufficient. Yet they did nothing to prevent the Commissioner from administering the STAAR test. And given that he has already done so for the 2023-2024 school year, no court can order prospective compliance with section 39.023(a-11) for that year. Because *ultra vires* relief is limited to prospective compliance with the statute, *see TEA v. Houston ISD*, 660 S.W.3d 108, 116 (Tex. 2023), no *ultra vires* relief is available for the 2023-2024 school year, and Plaintiffs' claim cannot succeed.

### b. The STAAR test is valid and reliable.

**i.** In their most extraordinary argument, Plaintiffs ask this Court (at 25-26) to conclude that the STAAR test is probably invalid and unreliable—a conclusion not based on any demonstrated flaw in the test, but on the fact that scores were lower than Plaintiffs thought they would be. Rather than point to any defect in the test, Plaintiffs' expert testified only that she had "concerns," "questions," and "wonderings." 3.RR.124, 144. "Speculation, of course, is not evidence," *Rollins v. Pressler*, 623 S.W.3d 918, 937 (Tex. App.—Houston [1st Dist.] 2021, pet. denied)—and certainly not sufficient evidence to throw out an entire year of accountability ratings. The reality, however troubling, was explained by a member of TTAC: "[A]ll the

8

evidence that we reviewed points to the fact that it's not the scoring system. This is actually a real decline in achievement that we should be concerned about and not try to sweep under the rug." 2.RR.184. But rather than address that concern, Plaintiffs have asked this Court to blame the test.

If the STAAR test were truly invalid and unreliable, Plaintiffs could have pointed to at least one question that did not align with the TEKS or found one expert to explain why the questions that survived review by TEA, its vendors, field testing, teachers, and TTAC, were still fundamentally flawed. But they did not. A decrease in scores alone is not evidence that the STAAR test is invalid and unreliable.

**ii.** Although Plaintiffs no longer appear to be arguing that the use of an automated scoring engine is itself an *ultra vires* act, they suggest (at 26) that there is a conflict of evidence regarding whether the use of the automated scoring engine rendered the STAAR test invalid and unreliable. There is not. The Commissioner's witnesses—who are experts in the use of automated scoring engines—explained how the automated scoring engine works to produce valid and reliable scores. 2.RR.102-07, 148, 155-67; 3.RR.177, 187-92, 207, 209-25. That is why it has been in use for over ten years and in over twenty States. 2.RR.103-04, 161. By contrast, Plaintiffs' expert on education policy—who performed no studies or expert analysis regarding the use of the engine—testified only that she had "questions" and "wonderings" about the use of the automated scoring engine. 3.RR.144. But having questions about reliability is not the same as producing evidence of unreliability. There is no fact issue.

Attempting through indirect means to show the engine is faulty, Plaintiffs hang their hat on two claims. First, they assert that there was an increase in the number of

9

zeros given on constructed-response questions, which they hypothesize is due to errors made by the scoring engine. But they ignore the fact that the number of higher scores on those questions also increased. 3.RR.179. And they produced no evidence showing that the engine *wrongly* assigned numerous zeros. Instead, they offer only the anecdotal testimony of one superintendent who could not explain why a student received a zero on a single question about Mexican pizza. 3.RR.167-68.[2] And they did not even demonstrate that the engine gave the zero, rather than a human grader. One superintendent's inability to explain one student's score on one question that may or may not have been graded by the engine does not justify concluding that the engine produces invalid and unreliable results.

Second, Plaintiffs make unsupported claims (at 12-15) about the engine's error rate. As explained in the Commissioner's opening brief, Texas permits districts to submit questions for rescoring if the district believes the grader (human or engine) incorrectly scored the result. 3.RR.61-62. Plaintiffs point to two districts that submitted an unknown number of questions for rescoring: One district saw 76% of its submitted questions receive a higher score, while the other saw only 28% rescored higher. 3.RR.150-51. From that, Plaintiffs attempt to extrapolate that the engine is wrong a disproportionate amount of the time. Appellees' Br. 14-15 (claiming the engine has an error rate of greater than 35%). Such reasoning reflects a misunderstanding of basic mathematics.

---

[2] The scoring rubric for this question is part of the record, 4.RR.1509-12, and is available online for any superintendent to view, https://tea.texas.gov/student-assessment/staar/2024-staar-3-rla-scoring-guide.pdf.

To take a seasonally appropriate example, if a football referee has two calls reviewed by instant replay over the course of a season and one call is reversed, it would not be proper to say that the referee is wrong 50% of the time. That ignores (1) the hundreds of other calls and non-calls he made over the course of the season, and (2) that instant replay is used only in the closest of cases. Here, the engine graded millions of tests, 4.RR.774, and only the ones most likely to be wrong were submitted for rescoring. That one district submitted, perhaps, 17 questions for rescoring and obtained higher scores on 13 of them (for a 76% rate), says nothing about the millions of questions that were not submitted for rescoring and were presumably graded correctly. Plaintiffs attempted a similar argument at the hearing, cross-examining a witness based on a TEA employee's affidavit that showed that 1222 questions graded by the engine were submitted for rescoring. 3.RR.193-96; CR.206. As that witness explained, Plaintiffs' attempt to draw any larger conclusions required knowing the denominator—the number of questions graded, 3.RR.194, which, in that case, was 2.3 million, CR.206. Thus, even if every one of the 1222 questions submitted had been incorrectly scored, the error rate would have been tiny.

Thus, Plaintiffs' proof that the STAAR test is invalid and unreliable comes down to evidence of one superintendent's confusion about one question and two districts that submitted an unknown number of questions for rescoring. Such hand-picked anecdotes do not call into question the validity and reliability of the STAAR test and the use of the scoring engine—especially in light of the multiple experts who testified regarding how the engine works and why it produces reliable results.

11

2.RR.102-07, 155-67; 3.RR.187-92, 209-25. Plaintiffs err when they claim that the STAAR test has become invalid and unreliable.

    **iii.** Faced with a dearth of actual evidence of invalidity and unreliability, Plaintiffs repeatedly claim that a TEA witness testified that a 2023 report showed that "the automated scoring engine 'was not successful.'" Appellees' Br. 12, 26, 35. That is not an accurate characterization of what the witness said. The witness was discussing a 2023 report in which the automated scoring engine was programmed with field-test data and operational data to see what worked. 4.RR.816-60. As she explained, "[t]he first run at our approach was not successful. So that's why we do in-window retraining." 3.RR.197. And that is backed up by the 2023 report. The first test of the automated engine, programmed with field-test data (Phases 1-3), did not produce satisfactory results, 4.RR.829-35—which is why the engine was reprogrammed with operational data. After that point, "[t]he automated scoring engine met the performance criteria for all items." 4.RR.835. In other words, TEA tested the system to learn what was successful and what was not before using it in real time. To take three words of a witness out of context, when the witness testified to how and why the engine produces accurate results, 3.RR.187-92, demonstrates only that Plaintiffs have no actual evidence that the engine renders the STAAR test invalid and unreliable.

    The rest of Plaintiffs' evidence attempts to draw unsupported conclusions from innocuous facts. Plaintiffs faulted one TEA witness (at 26) for not having a report about the performance of the automated scoring engine for 2024 when the witness testified that the report was not ready yet. 3.RR.196-99. They also faulted (at 14) that

same witness for not knowing information that was in the possession of a different group at TEA. 3.RR.193. And Plaintiffs complain (at 15) that TEA did not put documents into evidence regarding the performance of the automated scoring engine on the 2024 STAAR test. But as TEA's witness explained, those types of reports take six months to a year to complete. 3.RR.198. That a single witness does not have all information that TEA possesses at her fingertips is not a reason to doubt her testimony regarding the STAAR test.

In short, Plaintiffs can't find anything wrong with the STAAR test other than the fact that their students didn't perform as well as they had hoped. That does not raise a fact question whether the test is invalid or unreliable, and it does not demonstrate an *ultra vires* act by the Commissioner. A temporary injunction is not warranted on this ground.

### 2. The Commissioner provided all required notice.

**a.** Plaintiffs' next claim, that the Commissioner failed to provide notice of the accountability standards, is based solely on Texas Education Code section 39.0542. Appellees' Br. 27-29. That statute requires the Commissioner to "provide each school district a document in a simple, accessible format that explains the accountability performance measures, methods, and procedures that will be applied for that school year." Tex. Educ. Code § 39.0542(a). And that "simple, accessible format" must permit a school district to "easily distribute [it] to parents of students enrolled in the district and other interested members of the public." *Id.* § 39.0542(b). In other

words, this document's purpose is to educate the public about the accountability system so that interested citizens do not have to read and comprehend the 300-page Accountability Manual.

The Commissioner provided that document in March 2024. CR.212; 4.RR.810-14. As is apparent on its face, it is an overview of the three domains upon which accountability is based, what factors go into each domain, and anticipated changes to those measures. 4.RR.810-14. Given that Plaintiffs introduced this document into evidence themselves, they cannot and do not deny that they received it. Instead, they argue (at 27-28) that the document must be adopted as a rule and that it must have more final details about the accountability system.

The Court should reject those arguments for the reasons discussed below. But even if it agrees with Plaintiffs, there has been no *ultra vires* act because of the Commissioner's adoption of the 2024 Accountability Manual in May 2024. 49 Tex. Reg. 3280 (May 10, 2024). That Manual unquestionably gave school districts notice of "the accountability performance measures, methods, and procedures that will be applied for that school year." Tex. Educ. Code § 39.0542(a); *see also* 3.RR.116 (Plaintiffs' witness admitting "there are many other documents that provide information about the measures, methods, and procedures that the commissioner will use"). The Court could conclude its analysis with this observation alone. Plaintiffs timely received all required notice.

**b.** Should the Court choose to determine whose interpretation of section 39.0542 is correct, however, it should reject Plaintiffs' argument as unsupported by the statutory text.

*First*, contrary to Plaintiffs' assertions (at 28), the document described in section 39.0542 does not need to be adopted as a rule. Plaintiffs point to no language mandating a rule in the text of the statute, which requires only that the Commissioner "provide" the document. Instead, Plaintiffs attempt to equate the document required by section 39.0542 with the Accountability Manual, which must be adopted as a rule under section 39.054(a). Although the Court should not treat those statutes or documents as interchangeable, there is no question that the 2024 Accountability Manual was adopted as a rule, 49 Tex. Reg. 3280, so section 39.054(a) has been satisfied. But the document required by section 39.0542 is different: It is for the public to understand the accountability system, not for the school districts to learn its minute details. It is not the same document described in section 39.054(a) and need not be adopted as a rule.

*Second*, the document required by section 39.0542 does not need to have all the final details of the accountability system in it. *Contra* Appellees' Br. 27-28. As stated by the Legislature, the document should be in a "simple, accessible format" so that it can be easily distributed to members of the public. The 5-page document provided by the Commissioner fits that bill. 4.RR.810-14. The 300-page Accountability Manual does not. 19 Tex. Admin. Code § 97.1001.

*Third*, although disclaiming (at 29) any argument that they are relying on a "deadline," Plaintiffs continue to assert that the document cannot be provided at the end of the school year. *See also* Appellees' Br. 16 (repeatedly complaining that the information was not provided at the "beginning" of the school year). Plaintiffs base this argument on the language in section 39.0542 that the document explain the

15

measures that "will be applied for that school year." Tex. Educ. Code § 39.0542(a). But that language merely requires disclosure of the standards before those standards are applied. And the Commissioner has met that deadline. He provided the summary document in March 2024, CR.212, well before he applied any measures to assign accountability ratings (the very thing he has been enjoined from doing). And should the Court believe the 2024 Accountability Manual is the relevant document, he adopted that in May 2024, 49 Tex. Reg. 3280, again, prior to the application of the measures found within. The Commissioner has not applied any measures or standards of which the districts were not made aware, satisfying any statutory deadline Plaintiffs may raise. *See* Tex. Educ. Code § 39.0541 ("The commissioner may adopt indicators and standards under this subchapter at any time during a school year before the evaluation of a school district or campus.").

c. But even if the Court believes that the March 2024 summary document was insufficient and the 2024 Accountability Manual came too late, the remedy is not to eliminate accountability ratings. It is to require the Commissioner to comply with the law in the future by timely providing the proper notice. Plaintiffs' claim (at 31) that "[w]here courts find *ultra vires* conduct, courts craft the appropriate prospective remedy" is simply not the law. When a court determines a government official is acting *ultra vires*, the *only* permissible remedy consistent with the official's sovereign immunity is to order that official to comply with the law in the future. *Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1*, 669 S.W.3d 178, 183 (Tex. 2023) ("[S]overeign immunity does not prohibit a suit . . . seeking only prospective relief requiring the official's compliance with the law.").

16

Any remedy beyond bringing the official back in line with state law would require a waiver of sovereign immunity by the Legislature. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). Sovereign immunity does not provide leeway to "craft" anything else.

The only permissible *ultra vires* remedy here is to order the Commissioner to timely provide proper notice in the future—unless Plaintiffs can show that the failure to provide the document required by section 39.0542(a) eliminates the Commissioner's authority to issue accountability ratings, in which case issuing ratings would be *ultra vires*. They cannot make such a showing. Although Plaintiffs assert (at 32) that "it would be entirely appropriate for a court to conclude that he no longer has the authority to assign ratings for that school year," their citation to *In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 299 (Tex. 2022) (orig. proceeding), demonstrates the opposite. In *Stetson*, the Comptroller no longer had the authority to perform certain duties because the Legislature said so—the program at issue expired as a matter of law. *Id.* at 293 (explaining that the law provided that "no new applications may be approved after December 31, 2022"). No such language exists here.

And in circumstances like these, the rule is to presume that the Commissioner retains the authority to act. *Morath v. Lampasas ISD*, 686 S.W.3d 725, 742-44 (Tex. 2024) (citing multiple cases). That rule is especially relevant here, where the Education Code obligates the Commissioner to issue accountability ratings as a matter of law. Tex. Educ. Code § 39.054(a), (a-3). Plaintiffs fail to address any of the Supreme Court's precedent on that point or identify any statute that suggests the Legislature

17

intended the courts to remedy the Commissioner's failure to comply with section 39.0542(a) by eliminating an entire year of accountability ratings. At most, they cite the Commissioner's discretion to issue a "Not Rated" rating in certain circumstances. *Id.* § 39.054(a-4). But that proves the point—the Legislature has given the Commissioner the discretion when to issue a "Not Rated" rating. That exercise of discretion cannot be the subject of an *ultra vires* suit. *See Heinrich*, 284 S.W.3d at 372 (holding that an *ultra vires* suit "must not complain of a government officer's exercise of discretion").

This Court "should not invent a remedy that the Legislature itself could have, but did not, specify." *State v. Roland*, 973 S.W.2d 665, 666 (Tex. 1998) (per curiam). The Commissioner's authority to issue accountability ratings is unaltered regardless of whether he provides the required document under section 39.0542 (which he did). Plaintiffs cannot succeed on this claim. Thus, it provides no basis for upholding the temporary injunction.

### 3. The Commissioner's method of evaluating districts did not make it mathematically impossible for Plaintiffs to earn A.

Plaintiffs' argument that the Commissioner failed to "ensure that the method used to evaluate performance is implemented in a manner that provides the mathematical possibility that all districts and campuses receive an A rating" is unfounded and would result in the dilution of state standards. *See* Tex. Educ. Code § 39.054(b). As explained in the Commissioner's opening brief and agreed with by Plaintiffs (at 17), this language from section 39.054(b) prohibits the Commissioner from using a

"method," like a curve, that prevents all districts from earning an A. The Commissioner has complied with that statute by using cut scores, which enable all districts to earn an A if they score high enough. 3.RR.38. That is sufficient to satisfy the statute.

Further, to be clear, section 39.054(b) refers to "an overall and a domain performance rating." The CCMR score is neither of those, but only a component of those ratings for high schools. 2.RR.83, 185. There is, therefore, no requirement that campuses and districts be able to earn an A on the CCMR rate alone, and a failure to achieve in A on the CCMR component does not preclude a district from achieving an A overall or on each domain. 3.RR.239-40. And that makes Plaintiffs' evidence (at 17-18) insufficient. Their witnesses spoke only of whether schools and districts would earn an A on the CCMR rate, not on domain or overall ratings. 2.RR.201-03 (discussing a graph in which the Y-axis is the CCMR rate); 3.RR.169 (referring to multiple schools at Plano ISD that would not receive an A for their CCMR score).

On the law, Plaintiffs do not contest that cut scores are an appropriate method for evaluating districts under the statute. Their complaint concerns timing. Plaintiffs appear to agree (at 18) that the Commissioner could comply with the law by giving advance notice that he was going to raise the CCMR cut score to 88%, even if some districts ultimately could not reach that level. But the only difference between that hypothetical and the current reality is the timing of the announcement, not the "method" of evaluating districts, which is what section 39.054(b) concerns.

And that gets to the heart of Plaintiffs' complaint. They admit (at 18) that "it would have been mathematically possible for them to raise their cut scores" if they

had notice that they needed to raise them. Thus, for reasons not in the record, some school districts were apparently not attempting achieve as high a CCMR rate as possible prior to the Commissioner's decision to raise the cut score. Instead (as one superintendent described), they used their CCMR rate as a "crutch" to "help prop . . . up" high school campus ratings. 3.RR.96. But by statute, one objective of the public-education system is to ensure that students "will be prepared to succeed in a variety of postsecondary activities, including employment and enrollment in institutions of higher education." Tex. Educ. Code § 4.001(b). Accordingly, districts should have understood that a 60% CCMR rate was not sufficient, regardless of cut scores.

Merely labeling the Commissioner's action as a "retroactive change" is misplaced. Appellees' Br. 17-18. At no point did the Commissioner tell school districts that a 60% CCMR rate would be sufficient to earn an A in the 2023-2024 school year. Districts knew that the CCMR rate was a lagging indicator and that the Commissioner could raise the cut score. Indeed, use of prior year data is common when holding campuses and districts to account. *See, e.g.*, *Honors Acad., Inc. v. TEA*, 555 S.W.3d 54, 74 (Tex. 2018) (using prior year fiscal data to evaluate schools). Districts were never told that a 60% CCMR rate would earn them an A in 2023-2024, so there has been no "retroactive change."

Regardless, it was mathematically possible for every district to earn an A on the CCMR rate had they performed well enough—which they suggest they could have done if they'd had more notice. Thus, the fact that they will not receive an A demonstrates the truth: Plaintiffs *could* have done better at ensuring their graduates were

ready for life after high school. If Plaintiffs' future efforts produce higher scores, their future ratings will reflect that. But the Commissioner is not obligated to prevent the public from learning the results of Plaintiffs' past efforts. His decision to raise the CCMR rate did not implement a method that made it mathematically impossible for every district to earn an A and was not an *ultra vires* act.

## B. Plaintiffs have not shown imminent, irreparable harm.

Because Plaintiffs are unlikely to succeed on the merits of their claims, there is no need for the Court to undertake any further analysis. *See Anti-Defamation League*, 610 S.W.3d at 917. But should the Court proceed further, Plaintiffs have failed to introduce evidence of an irreparable, probable, and imminent injury. *Butnaru*, 84 S.W.3d at 204. This is so for three reasons: lack of evidence of an injury, Plaintiffs' own litigation strategy, and the resulting harm to students and the public.

*First*, Plaintiffs make no response to the Commissioner's argument (at 36-37) that they have not demonstrated that any of them will, in fact, receive a lower rating as a result of the Commissioner's allegedly *ultra vires* actions. It is certainly possible that Plaintiffs will receive a lower rating than they would prefer. But a possibility is not a probability and does not warrant injunctive relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The Court cannot assume facts on behalf of Plaintiffs.

Plaintiffs' list of potential consequences (at 33-34) should their accountability rating be low is also largely hypothetical. One superintendent testified that his district's ability to operate a virtual campus would be "in jeopardy," 3.RR.98, but he did not testify how likely it would be that they would lose that ability. And Plaintiffs

21

provided no further specificity about the harm that would come to *them* if ratings were released. Instead, they generally asserted that accountability ratings impact accreditation and a district's status as a district of innovation, can result in oversight by the Commissioner, and could prompt parents to leave the district. 3.RR.98, 106, 233-24. But they introduced no evidence that they themselves were likely to feel these effects. Further, their claim (at 33-34) that an unspecified number of students might be incorrectly graded on the STAAR test could be easily remedied by using the rescoring procedures available to all districts, 3.RR.61-62, without having to eliminate accountability ratings altogether. Without evidence of specific harm to Plaintiffs themselves, they are not entitled to injunctive relief.

*Second*, this emergency has been brought about by Plaintiffs' own litigation strategy of choosing to file suit, not when the alleged violation arose and there was time to address it, but three days before the Commissioner's deadline to release accountability ratings.[3] For example, Plaintiffs have known since the 2023 *Kingsville* litigation that the Commissioner considers TTAC to fulfill the independent-entity requirement. Yet they did nothing to stop the STAAR test from being administered. Plaintiffs knew they did not have whatever notice they believed was required at the beginning of the year but did not file suit then to obtain it.[4] And they knew the CCMR

---

[3] Indeed, only five districts actually filed suit before the deadline, CR.5-30, with another twenty-eight joining the day of the temporary-injunction hearing, CR.486-516, long after ratings should have issued.

[4] Nor did they ask the trial court to order the Commissioner to produce that document for the 2024-2025 school year—so we may all be here again if Plaintiffs wait to file suit in August.

cut score would be raised by November 2023, when it was part of the 2023 Accountability Manual, 48 Tex. Reg. 6593, 6593-605 (Nov. 10, 2023), but did not even comment on the CCMR score in the proposed 2024 Accountability Manual when they had the chance, 49 Tex. Reg. at 3281-84. Such deliberate delay does not warrant the extraordinary relief of an injunction barring all accountability ratings from being issued.

And *third*, Plaintiffs complain (at 33) that, once the ratings are issued, there might be nothing they can do to put the toothpaste back in the tube. But students are feeling the effects today. The purpose of the accountability regime is to ensure that students are receiving their constitutionally appropriate education. *Morath v. Tex. Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 849 (Tex. 2016). And by eliminating judicial review of assigned accountability ratings, Tex. Educ. Code 39.151(d), the Legislature has made clear that fights about accountability ratings should not be held up in courts for years. If a campus or district has a poor accountability rating that the Commissioner cannot reveal, the public cannot demand that action be taken to fix it because there can be no accountability without visibility.

Texas has a *public*-education system—it serves the public and is run by members of the public. Yet Plaintiffs want to keep the public in the dark, to the detriment of students. The resulting harm from the Court's injunction counsels against affirmance.

## II. Because Plaintiffs Failed To Establish a Viable *Ultra Vires* Claim, Sovereign Immunity Bars Their Suit.

In addition to erroneously granting a temporary injunction, the trial court also erred in denying the Commissioner's plea to the jurisdiction. Anytime a court detects a jurisdictional problem, it must resolve that issue before the case proceeds. *Rattray v. City of Brownsville*, 662 S.W.3d 860, 867 (Tex. 2023). Here, that jurisdictional problem is sovereign immunity. Plaintiffs must "affirmatively demonstrat[e] actionable ultra vires conduct by [the Commissioner] in order to avoid dismissal on jurisdictional grounds due to sovereign immunity." *Matzen*, 659 S.W.3d at 388. They have not done so.

To avoid this result, Plaintiffs ask the Court (at 36-37) to ignore the affidavits submitted with the Commissioner's plea to the jurisdiction. The trial court's order on the Commissioner's plea, however, explicitly stated that it considered "the evidence," CR.544, and the only evidence that was part of the plea to the jurisdiction was that attached to the Commissioner's plea. Because Plaintiffs made no substantive response to the Commissioner's plea, CR.413-34, the Commissioner's argument and evidence require dismissal of Plaintiffs' claims.

Regardless, Plaintiffs' claims are barred on the pleadings alone.

**Validity and reliability:** Plaintiffs' petition concedes that TTAC advises the Commissioner regarding the STAAR test. CR.498. For the reasons described above, *see supra* pp. 4-6, review by TTAC suffices to meet the Commissioner's independent-entity obligation under section 39.023(a-11). To avoid this conclusion, Plaintiffs baldly declare that the STAAR test was not determined to be valid and reliable by an

independent entity, CR.498-99, 502, but their petition is devoid of factual allegations that would support that claim. While Texas is a notice pleading State, plaintiffs are still obligated to demonstrate that there is jurisdiction over their claims. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). Plaintiffs' conclusory allegations contradict their concession that TTAC advises the Commissioner and are not enough to establish jurisdiction over their *ultra vires* claim.

Moreover, Plaintiffs' remedy is not one permitted under the *ultra vires* doctrine. As explained above, courts in *ultra vires* cases may order only prospective compliance with the statute that is allegedly being violated. *Houston ISD*, 660 S.W.3d at 116. Because section 39.023(a-11) specifically requires the independent entity to determine the STAAR test is valid and reliable *before* the test is administered, no such relief can be given for the 2023-2024 school year, as the STAAR test has already been administered. Nor can the Court award Plaintiffs the other relief they seek—rescoring millions of STAAR tests with human graders, CR.509, as no statute requires the Commissioner to do that. At most, the Court could require compliance with section 39.023(a-11) for the 2024-2025 school year and beyond—if the Court first concludes that review by TTAC is not sufficient. But because TTAC's review satisfies the Commissioner's obligation, he has committed no *ultra vires* act and this claim should be dismissed.

**Fair notice:** The fair-notice claim must be dismissed because, at a bare minimum, the 2024 Accountability Manual was adopted during the school year, satisfying any statutory deadline Plaintiffs could or did identify. 49 Tex. Reg. 3280. Further, the elimination of accountability ratings is not a proper *ultra vires* remedy for

the alleged failure to comply with section 39.0542. *See supra* pp. 16-18. The Commissioner has met his deadlines, and Plaintiffs have not demonstrated an *ultra vires* act.

**Mathematical possibility of an A:** As described above, the use of cut scores is a method that permits all districts to earn an A if they perform well enough, which is all that is required by section 39.054(b). *See supra* pp. 18-19. Plaintiffs had both the opportunity and the incentive to earn as high a CCMR rate as possible. *See* Tex. Educ. Code § 4.001(b). Their failure to do so does not mean it was mathematically impossible for them to do so—they simply made different choices regarding how to use their resources. Increasing the CCMR cut score was not an *ultra vires* act.

\* \* \*

To date, the Commissioner has been prohibited from issuing accountability ratings, first, by the trial court's improper injunction, and second, by its unlawful "delay" of supersedeas. CR.538-39. The delay has gone on long enough. Plaintiffs' brief makes clear that their claims are meritless. But these annual lawsuits appear to be their strategy going forward: After finishing his cross examination of TEA's witness (who testified both in this lawsuit and last year's *Kingsville* litigation), opposing counsel commented, "See you next year." 3.RR.89. That will undoubtedly be the case should this Court permit school districts to delay the issuance of accountability ratings through claims unsupported in law and fact. The Court should reverse the grant of the temporary injunction and render judgment dismissing this case for lack of jurisdiction.

26

## PRAYER

The Court should reverse the trial court's temporary-injunction order and render judgment dismissing this case for lack of jurisdiction.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

AARON L. NIELSON
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

/s/ Beth Klusmann
BETH KLUSMANN
Assistant Solicitor General
State Bar No. 24036918
Beth.Klusmann@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Appellant

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this brief contains 7,185 words, excluding exempted text.

/s/ Beth Klusmann
BETH KLUSMANN

27

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nancy Villarreal on behalf of Beth Klusmann
Bar No. 24036918
nancy.villarreal@oag.texas.gov
Envelope ID: 96373354
Filing Code Description: Other Brief
Filing Description: 20250117 PecosISD ReplyBr__Final
Status as of 1/17/2025 4:04 PM CST

Associated Case Party: Pecos-Barstow-Toyah Independent School District, et al.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin OHanlon | | kohanlon@808west.com | 1/17/2025 3:56:24 PM | SENT |
| David Campbell | | dcampbell@808west.com | 1/17/2025 3:56:24 PM | SENT |
| Lea Ohrstrom | | lohrstrom@808west.com | 1/17/2025 3:56:24 PM | SENT |
| Kathryn French | | kfrench@808west.com | 1/17/2025 3:56:24 PM | SENT |

Associated Case Party: Mike Morath

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beth Klusmann | | beth.klusmann@oag.texas.gov | 1/17/2025 3:56:24 PM | SENT |
| Kelsey Warren | | kelsey.warren@oag.texas.gov | 1/17/2025 3:56:24 PM | SENT |
| Marlayna Ellis | | marlayna.ellis@oag.texas.gov | 1/17/2025 3:56:24 PM | SENT |
| LaShanda Green | | LaShanda.Green@oag.texas.gov | 1/17/2025 3:56:24 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 1/17/2025 3:56:24 PM | SENT |